

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-21-1997

# Phillips v. Keyport

Precedential or Non-Precedential:

Docket 95-5143

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Phillips v. Keyport" (1997). *1997 Decisions.* Paper 43.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/43

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 95-5143

GEORGE PHILLIPS; PHILIP VITALE
Appellants

v.

BOROUGH OF KEYPORT; VICTOR RHODES; BOARD OF ADJUSTMENT

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civil Action No. 93-cv-00415)

Argued December 8, 1995

BEFORE:  STAPLETON, SAROKIN,* and ROSENN, Circuit Judges

Reargued En Banc
September 19, 1996

BEFORE:  SLOVITER, Chief Judge, BECKER, STAPLETON,
         MANSMANN, GREENBERG, SCIRICA, COWEN, NYGAARD,
         ALITO, ROTH, LEWIS, McKEE and ROSENN,
         Circuit Judges

(Opinion Filed February 21, 1997)

Lewis H. Robertson (Argued)
Evans, Osborne, Kreizman & Bonney
P.O. Box BB
Red Bank, NJ 07701
 Attorney for Appellants

* Hon. H. Lee Sarokin heard argument before the original panel
  but retired from office prior to the en banc hearing.

1

Frank N. Yurasko
63 Route 206 South
P.O. Box 1041
Somerville, NJ 08876

Gordon N. Litwin (Argued)
Ansell, Zaro, Bennett & Grimm
60 Park Place
Newark, NJ 07102
 Attorneys for Appellee
 Borough of Keyport

Michael A. Irene, Jr.
Suite 6
422 Morris Avenue
Long Branch, NJ 07740
 Attorney for Appellee
 Board of Adjustment

---

OPINION OF THE COURT

---

STAPLETON, Circuit Judge:

Appellants planned to open an adult book and video store, "X-Tasy", in the Borough of Keyport, New Jersey. Over a ten month period, they sought the necessary zoning and construction permits. Their applications were ultimately denied on the basis of an "adult entertainment uses" ordinance enacted by the Borough allegedly in response to those applications. Appellants insist that delays, denials, and revocations in the permitting process violated their right to substantive due process, that the ordinance violates their right to freedom of speech, and that they are entitled to recover litigation expenses under 42 U.S.C. § 1988. Appellants also contend that the Borough

2

is equitably estopped to deny that they are authorized to pursue their project.

## I.  The Factual Background

In early 1992, George Phillips and Philip Vitale spotted an abandoned one-story building on Route 36 in the Borough of Keyport, a 1.5-square-mile community in Monmouth County, New Jersey.  After visiting the site, they became interested in the property as a potential location for an adult video and book store.  After checking zoning and land use regulations, they met with the owner to negotiate a lease of the property.  The parties agreed that, if Phillips and Vitale could obtain a zoning permit for the intended use of the property, they would execute a lease.

Phillips contacted Vic Rhodes, construction official and zoning officer of the Borough, and asked him to perform an unofficial inspection of the property to advise plaintiffs as to what they would need in order to obtain a certificate of occupancy.  He did so on February 18th, and informed Phillips and Vitale that they would have to comply with various requirements regarding designation of parking places.  A week later, Phillips and Vitale submitted to Rhodes an application for a zoning permit to "operate a retail book store w/ novelties - amusements & videos."  App. at 29.  The address listed on the application was "#65 Hwy. 36."  Id.  The line below the address specified, "Block 103, Lot 59."  Id.  Attached to the application was a survey of

"Lots 59 & 61, Block 103 of the Official Tax Map of the Borough of Keyport."  App. at 30.

The property that Phillips and Vitale eventually leased -- and that Rhodes inspected -- is actually located on Lot 61. While Lots 59 and 61 are contiguous, they are situated in different zoning areas.  Lot 59 is located in a district zoned as "residential."  Lot 61 is situated in a "highway commercial" district.  The survey clearly indicated which land was Lot 59 and which was Lot 61.

A few days later, Rhodes telephoned Vitale and requested that he clarify the nature of plaintiffs' intended use of the property.  Vitale complied by describing the intended use in writing as "(1) video sales & rentals"; "(2) amusements – adult video arcade"; and "(3) no one under 21 years of age admitted."  App. at 31.  There was at that time no zoning restriction specifically pertaining to commercial establishments selling, renting or exhibiting sexually explicit material.  On March 9th, Rhodes issued to plaintiffs a zoning permit for Block 103, Lot 59.

On March 13th, Phillips and Vitale entered into a five-year lease for "[t]hat portion of the premises known as Block 103, Lot 59 also known as 65 Highway 36."  App. at 32.  The lease specified that the premises were to be used for "video sales and rental, amusements and adult video arcade" and as "a retail adult book store with novelties and gifts," and that "[n]o one under 21 years of age [would be] admitted to the premises." The lessees agreed to "obtain any and all necessary government

4

permits and approvals to conduct the business as deemed necessary by such governmental entities."

On March 18th, Rhodes issued plaintiffs three construction permits under their zoning permit. Plaintiffs allege that they thereafter expended substantial sums of money to repair and renovate the property for their intended use.

By this time, however, word of the plans for an adult book store had spread around the Borough and had generated significant opposition. Charles Barreca, who lives directly behind the property at issue, stated at a Borough Council meeting on March 23rd that he would do all he could to stop plaintiffs from opening their proposed store and that he had begun to circulate a petition in the area to that end. At the same meeting, the Borough attorney explained that the Zoning Board of Adjustment could review and overturn Rhodes's decision to issue the zoning permit. Other local leaders, including the mayor, also voiced their opposition. Faithful to his promise, on March 29th, Barreca appealed the issuance of the zoning permit to the Board, and the Board announced that it would review the matter at its upcoming meeting, on April 20th. On April 2nd, Rhodes issued and posted a "stop construction" notice, ordering plaintiffs to stop work at "Block 103, Lot 61, 65 Hwy 36" until the appeal was resolved. The appeal was based on the mistaken identification of the lot number.

On April 14th, Phillips and Vitale filed a second application for a zoning permit, this time with the proper address of the location. The application stated that their

5

intention was "to operate a retail bookstore w/ novelties, amusements & videos, adult video arcade, video sales & rentals (no one under 21 years of age admitted)."  App. at 42.

On April 20th, the Board of Adjustment held its hearing on the first application.  Barreca attended, along with another resident, to urge reversal.  Phillips and Vitale were represented by counsel, who admitted that the permit had been issued for Block 103, Lot 59, that this location was in a residential district, and that his clients' intended use was not permitted in such a district.  Barreca and his supporter submitted eight photographs purporting to show that the present condition of the plaintiffs' proposed building and site differed from the conditions represented on the old survey attached to their application for the zoning permit.  On the basis of this evidence, the Board granted the appeal and reversed Rhodes's decision to issue the initial zoning permit.

Eight days later, Rhodes advised plaintiffs that their second application for a zoning permit had been denied due to (1) inaccuracies in the survey they had submitted with the application, (2) the need to replace a fence pursuant to Ordinance 25:1-14.6.B, and (3) reports from a previous tenant that the sewer line servicing the building did not operate. Phillips and Vitale undertook to correct the problems and, on June 16th, submitted a third application for a zoning permit, together with a revised survey and receipts for sewer line repairs.

A week later, while the plaintiffs' third application was pending, members of the Borough Council introduced at a Council meeting two ordinances targeted at establishments involved in so-called adult entertainment. Ordinance No. 30-92, entitled "Public Indecency," would prohibit female topless and bottomless exhibitions and male bottomless exhibitions. It was patterned after the Indiana statute upheld by the Supreme Court in Barnes v. Glen Theatre, Inc., 501 U.S. 560 (1991). Ordinance No. 31-92, entitled "Adult Entertainment Uses," ("the Ordinance" or "Ordinance 31-92") would restrict adult entertainment uses to industrial districts and prohibit them within 1000 feet of residential zones, schools, churches, and public playgrounds, swimming pools, parks and libraries. Under the proposed scheme, Phillips and Vitale would need a use variance to open their store, because they were located in a highway commercial district. The Council referred the second ordinance to the Borough Planning Board for review. In connection with the ordinances, Mayor John J. Merla stated to the Asbury Park Press correspondent:

We're not going to tolerate this kind of filth in the Borough of Keyport. We don't support it (adult entertainment) going into any community in the Bayshore.

App. at 14-15.

On July 23rd, the Borough Planning Board held a public meeting to consider proposed Ordinance No. 31-92. The Board had earlier solicited and reviewed a legal opinion concerning the Ordinance, and at the hearing, it heard an oral presentation by

7

an engineering expert.  It recommended that the Council pass the proposed ordinance, but suggested three changes, the most significant of which was to reduce the "buffer zone" from 1000 to 500 feet.

At the Council meeting on July 28th, the Council adopted Ordinance No. 31-92 as amended in light of the Planning Board's suggestions.  The minutes of the meeting indicate that, although the meeting was open to the public for comments, the sole comment on Ordinance No. 31-92 was made by the Borough counsel, reporting the Planning Board's recommended changes and stating that the mayor had disqualified himself at the Planning Board meeting.  Ordinance No. 31-92 contained the following legislative findings and prohibitions:

> (a)  In the development and execution of this section it is recognized that there are certain uses which, because of their very nature, are recognized as having serious objectionable operational characteristics.
>
> These uses create and promote a deleterious effect on the Borough's neighborhood characteristics, administration of schools, and the commercial and economic viability of the community.  These uses impact on the Borough's neighborhood areas and conflict with the intent of the Borough Master Plan, particularly those segments listed on pages 16 and 19 therein which provide that a primary zoning objective is to preserve and protest [sic] existing residential areas and to enhance the desirability thereof.  Adult Entertainment Uses are such uses.
>
> The Borough of Keyport is a small residential community with its commercial areas and zones highly integrated with its residential properties.  The commercial properties are in close proximity to its educational, religious, residential and youth recreation facilities with a high volume of pedestrian

activity, including children throughout the area.

The industrial zone as it exists is not comprised of major industrial operations, but of mixed use nature including retail/commercial uses, it is so situated as to provide easy access and highway exposure. The industrial zone is suitably distant and buffered from the residential and mixed commercial zones as to minimize a negative or deleterious effect.

In order to prevent the deterioration of the community, to preserve the neighborhoods of the Borough of Keyport, to ensure the economic prosperity of the community, and to provide for the protection and well being of the quality of life in the Borough of Keyport, certain regulations are necessary to prevent these adverse effects.

(b) Adult Entertainment Uses[1] are prohibited in all zones, except where expressly permitted.

---

1. Ordinance 31-92 provides the following definition of "Adult Entertainment Uses":

ADULT ENTERTAINMENT USES, INCLUDE:

(1)        ADULT BOOKSTORE – An establishment having as a substantial or significant portion of its stock in trade books, magazines, other periodicals, or any tangible items and objects, not necessarily of a reading or photographic nature, which are distinguished or characterized by their emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas, as defined below, or an establishment with a segment or section devoted to the sale or display of such material.

(2)        ADULT MOTION PICTURE THEATER – An enclosed building with a capacity of fifty (50) or more persons used for presenting material distinguished or characterized by an emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas, as defined below, for observation by patrons therein.

(3)        ADULT MINI MOTION PICTURE THEATER – An enclosed building with a capacity for less than fifty (50) persons used for presenting material distinguished or characterized by an emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas, as defined below, for observation by patrons therein.

(c) In such zones where Adult Entertainment Uses are expressly permitted, no Adult Entertainment Use shall be located:

(a) within 500 feet of any residence, residential use and/or residential zone; or

(b) within 500 feet of any of the following users:

1. Churches, monasteries, chapels, synagogues, convents, rectories, religious artifice or religious apparel stores, or any religious use; or

2. Schools, up to and including the twelfth (12) grade, and their adjunct play areas; or

3. Public playgrounds, public swimming pools, public parks and public libraries.

App. at 59 (codified at Keyport, N.J., Rev. Gen Code, ch. XXV, § 25:1-15.15 (1992)).


On September 9th, Rhodes informed Phillips and Vitale by letter that their third application for a zoning permit was (..continued)

(a)  For the purpose of this subsection, "specified sexual activities" is defined as human genitals in a state of sexual stimulation or arousal; acts of human masturbation, sexual intercourse or sodomy; and fondling or other erotic touching of human genitals, pubic region, buttock or female breast; and "specified anatomical areas" is defined as less than completely and opaquely covered human genitals, pubic region, buttock or female breast below a point immediately above the top of the areola; and human male genitals in a discernibly turgid state, even if completely and opaquely covered.

(4)  CABARET - An establishment which features go-go dancers, exotic dancers, strippers, or similar entertainers. App. at 57-58 (codified at Keyport, N.J., Rev. Gen. Code, ch. XXV, § 25:1-3(a) (1992)).

10

denied because: (1) they lacked "ample parking," (2) a site plan was required, and (3) issuance of the permit sought would be inconsistent with "31-92 Section 2 25:1-15.15.b Adult Entertainment Uses." App. at 70. Phillips and Vitale appealed the denial, and the Board of Adjustment held public hearings on the appeal. On December 21st, a unanimous Board voted to deny the appeal, finding that plaintiffs' proposed use fell within the definition of Adult Entertainment Uses and that such uses were prohibited in a highway commercial district, where plaintiffs' site was located. The Board also found that plaintiffs had failed to demonstrate that Rhodes erred regarding the issues of inadequate parking and the need for a site plan. Phillips and Vitale then instituted this suit.

II.   The Issues On Appeal And The District Court Process

In this appeal, Phillips and Vitale advance four arguments: (1) Ordinance No. 31-92 violates their right of free expression because it is not narrowly tailored to achieve a substantial, content-neutral governmental interest and because it does not leave adequate alternative channels of communication; (2) the Borough violated their right to substantive due process by revoking their original permits, by delaying action on their two subsequent applications, and by denying their third application based on Ordinance No. 31-92; (3) they are "prevailing parties" entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and (4) the Borough is equitably estopped from revoking their original permits.

In response to the complaint, Rhodes and the Borough filed a motion to dismiss rather than an answer.[2]  The district court denied their motion.  In the course of doing so, the court ruled on the basis of the allegations of the complaint that Ordinance No. 31-92 is content neutral and serves a substantial state interest.  The only governmental interests identified by the district court were "preserving the quality of urban life" and "shielding minors from sexually explicit materials" -- interests quoted not from the Ordinance or the record but from Supreme Court cases.  App. at 140-41.  See Young v. American Mini Theaters, Inc., 427 U.S. 50, 71 (1976) (plurality opinion)

_____

2.  The Board of Adjustment filed a motion to dismiss and, later, an answer to the complaint.  This answer consisted primarily of general denials and did not identify any secondary effects that might justify Ordinance 31-92.

("[I]nterest in attempting to preserve the quality of urban life is one that must be accorded high respect."); Ginsberg v. New York, 390 U.S. 629, 639-40 (1968) (state's "interest in the well-being of its youth" justified some restriction of the First Amendment). The court declined to grant the motion to dismiss, however, because it was unclear from the complaint and exhibits (a) whether the Ordinance provided alternative channels for adult entertainment expression, and (b) whether the Borough was equitably estopped from prohibiting the plaintiffs' proposed use. It did hold that the complaint failed to state a substantive due process claim and dismissed that count of the complaint.

The district court thereafter entertained the plaintiffs' motion for summary judgment on their challenge to Ordinance No. 31-92 and their motion for a preliminary injunction barring enforcement of that Ordinance. On June 15, 1994, the district court conducted an evidentiary hearing on the issue of whether Ordinance 31-92 left alternative channels available for adult entertainment. A second evidentiary hearing was held two days later to receive evidence on the equitable estoppel issue. At the beginning of this hearing, defense counsel announced that the Borough Council had met in special session on the evening of June 15, 1994, and had declared an intention to amend the Ordinance to reduce the buffer from 500 feet to 300 feet.

Both motions were ultimately denied. The district court viewed the record as establishing that the Ordinance, as amended to reduce the buffer zone to 300 feet, afforded a constitutionally sufficient opportunity for adult entertainment

13

expression. This finding, together with the conclusions reached in deciding the motion to dismiss, meant that Ordinance No. 31-92 was constitutional and that plaintiffs could not demonstrate a likelihood of success on this claim. The court expressed no view regarding the constitutionality of the 500 foot buffer version of the Ordinance.

The district court's third and final order came in response to the plaintiffs' motion for summary judgment on their equitable estoppel and § 1988 claims. The district court first ruled that the undisputed record facts established a lack of reasonable reliance by the plaintiffs. The district court then found that the plaintiffs were not "prevailing parties" within the meaning of § 1988. The resulting order denied plaintiffs' motion for summary judgment and concluded as follows:

> FURTHER ORDERED that since there remain no issues of material fact and this Court having resolved all legal issues in defendants' favor, that the above-captioned action be and is hereby DISMISSED in its ENTIRETY as MOOT.

Order of Feb. 14, 1994, App. at 247.

### III. The Challenge to Ordinance No. 31-92

Speech, be it in the form of film, live presentations, or printed matter, that is sexually explicit in content but not "obscene" is protected under the First Amendment. Schad v. Borough of Mt. Ephraim, 452 U.S. 61, 65-66 (1981); Mitchell v. Comm'n on Adult Entertainment Establishments, 10 F.3d 123, 130 (3d Cir. 1993). The Fourteenth Amendment extends this protection to the state and local levels. 44 Liquormart, Inc. v. Rhode

14

Island, 116 S. Ct. 1495, 1514 (1996). However, not every regulation of protected speech violates the First Amendment; nor is every form of speech regulation subject to the same degree of scrutiny when challenged in court. As the Supreme Court explained in Turner Broadcasting System, Inc. v. F.C.C., 114 S. Ct. 2445, 2459 (1994) (citations omitted):

Our precedents . . . apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content. . . . In contrast, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny, because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue.

State regulations of speech that are not regarded as content neutral will be sustained only if they are shown to serve a compelling state interest in a manner which involves the least possible burden on expression. Regulations of speech that are regarded as content neutral, however, receive "intermediate" rather than this "exacting" or "strict" scrutiny. This includes regulations that restrict the time, place and manner of expression in order to ameliorate undesirable secondary effects of sexually explicit expression. City of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986) (zoning ordinances designed to combat the undesirable secondary effects of businesses that purvey sexually explicit material are to be reviewed under the standards applicable to "content-neutral" time, place, and manner regulations). We articulated the "intermediate scrutiny" standard applicable to such measures in Mitchell v. Comm'n on

15

Adult Entertainment Establishments, 10 F.3d 123, 130 (3d Cir. 1993):

[R]easonable time, place, and manner regulations of protected speech are valid if: (1) they are justified without reference to the content of the regulated speech; (2) they are narrowly tailored to serve a significant or substantial government interest; and (3) they leave open ample alternative channels of communication.

Thus, when a legislative body acts to regulate speech, it has the burden, when challenged, of showing either (1) that its action serves a compelling state interest which cannot be served in a less restrictive way, or (2) that its action serves a substantial, content-neutral, state interest, is narrowly tailored to further that substantial state interest, and leaves adequate alternative channels for the regulated speech. If the state chooses the second alternative in a setting like the present one, it must come forward with "evidence of incidental adverse social effect that provides the important governmental interest justifying reasonable time, place and manner restrictions on speech or expressive conduct." Id. at 133. Moreover, the legislative body "must . . . be prepared . . . to articulate and support its argument with a reasoned and substantial basis demonstrating the link between the regulation and the asserted governmental interest." Id. at 132.

A. Content Neutrality And Narrow Tailoring

The district court concluded, on the basis of the legislative findings contained in Ordinance No. 31-92, that the

16

Ordinance is an effort to suppress the secondary effects of sexually explicit expression and not sexually explicit expression itself. Apparently, it further tacitly concluded, without explanation, that Ordinance No. 31-92 was narrowly tailored to achieve that objective. We conclude that the district court was simply not in a position to make these findings.

These findings were made by the district court when the case was in an unusual procedural posture. It sustained the constitutionality of an ordinance substantially burdening the exercise of protected speech (1) without an answer from the defendants identifying the secondary effects alleged to justify the burden on expression, and (2) without a record supporting the reasonableness of any legislative expectations regarding the likelihood of these secondary effects and the ameliorative effect of the ordinance.

The complaint alleges that the plaintiffs wished to disseminate adult entertainment and that the defendants "applied an unconstitutional ordinance to [them] with a purpose to restrain their sale, rental, exchange and exhibition of adult-theme videos, as well as adult books, magazines and the like because of their content." ¶ 60. It further alleges, inter alia, that the ordinance burdens only adult entertainment expression, "is not rationally related to a valid governmental purpose," "is not intended to further any substantial or compelling governmental purpose," "significantly restricts access to protect[ed] speech," "is not supported by a reasoned or significant basis," "is not narrowly tailored," and "is a

17

subterfuge for the suppression of expression protected by the First Amendment."  ¶ 61.

When an ordinance burdening speech is thus challenged, it must be "justified" by the state.  Renton, 475 U.S. at 48. However, because the Borough filed no answer in this case, we do not yet know how the Borough will seek to justify the Ordinance.  There is no articulation by the state of what it perceives its relevant interests to be and how it thinks they will be served. This is particularly troublesome in a case, like this, where the legislative findings speak in terms of "serious objectionable operational characteristics," "deleterious effects," and "the deterioration of the community" without identifying in any way those "characteristics," those "effects," or that "deterioration."

On remand, the Borough must be required to articulate the governmental interests on the basis of which it seeks to justify the ordinance.  It should then have to shoulder the burden of building an evidentiary record that will support a finding that it reasonably believed those interests would be jeopardized in the absence of an ordinance and that this ordinance is reasonably tailored to promote those interests.  It is the Borough that carries the burdens of production and persuasion here, not the plaintiffs.  Renton, 475 U.S. 41; Schad v. Mount Ephraim, 452 U.S. 61 (1981).  Moreover, it is the district court, not the Borough, that must make the findings necessary to determine whether the ordinance is consistent with the First Amendment.  See id.; Renton, 475 U.S. 41.

18

It is clear from the district court's opinion that it believed its conclusions to be dictated by Renton v. Playtime Theatres, Inc. The Supreme Court there upheld the constitutionality of a municipal ordinance of the City of Renton, Washington, that prohibited any "'adult motion picture theater' from locating within 1000 feet of any residential zone, . . . dwelling, church, or park, and within one mile of any school." 475 U.S. at 44. Renton is a city of approximately 32,000 people located just south of Seattle. The Court held, inter alia, that the Renton Council was entitled to rely "on the experience of, and studies produced by, the City of Seattle," id. at 51, concerning the secondary effects of such theaters. As the Court put it, "The First Amendment does not require a city, before enacting an ordinance, to conduct new studies or produce new evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." Id. at 51-52.

The Renton Court did not sustain the constitutionality of the ordinance before it based solely on legislative findings there recited. The city justified the ordinance by placing the Seattle studies in the record and the Court concluded that these studies could reasonably be believed relevant to the problem that the city was facing. Here, the district court had no way of knowing what problem or problems the Borough thought it was facing and there is no study or other evidence in the record concerning the secondary effects of "adult entertainment uses."

19

Moreover, because the problem or problems that the Borough believes it was facing have not been identified, the district court was in no position to determine whether Ordinance 31-92 was "narrowly tailored" to effectively ameliorate the interest or interests the Borough sought to serve. While the requirement of narrow tailoring does not mean that the ordinance must be the least restrictive means of serving the Borough's substantial interests, "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989). Accordingly, the issue of narrow tailoring cannot be determined without knowing the undesirable secondary effects the Borough relies upon to justify its ordinance and more about the effect of Ordinance 31-92 in the context of the Borough of Keyport.

Renton does not signal an abandonment of the elements of the intermediate scrutiny standard that the Supreme Court has traditionally applied to content neutral regulation of speech. See, e.g., Ward v. Rock Against Racism, 491 U.S. 781 (1989); Barnes v. Glen Theatre, Inc., 501 U.S. 560 (1991); City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410 (1993); Turner Broadcasting System, Inc. v. F.C.C., 114 S. Ct. 2445 (1994). In Turner Broadcasting, the Supreme Court held that a summary judgment upholding the constitutionality of the FCC's "must carry" provisions for cable stations was improperly granted. The Court was divided on whether the challenged provisions were content neutral and, accordingly, on the level of

20

scrutiny that should be applied.  A majority agreed, however,

that the challenged provisions would not survive intermediate

scrutiny and emphasized the importance of applying the

traditional elements of intermediate scrutiny in a realistic

manner.  Justice Kennedy, joined by the Chief Justice, Blackmun,

J., and Souter, J., found the intermediate scrutiny standard

articulated in United States v. O'Brien, 391 U.S. 367 (1968)[3], to

be applicable and observed:

> That the Government's asserted interests are
> important in the abstract does not mean,
> however, that the must-carry rules will in
> fact advance those interests.  When the
> Government defends a regulation on speech as
> a means to redress past harms or prevent
> anticipated harms, it must do more than
> simply "posit the existence of the disease
> sought to be cured."  Quincy Cable TV, Inc.
> v. FCC, 768 F.2d 1434, 1455 (CADC 1985).  It
> must demonstrate that the recited harms are
> real, not merely conjectural, and that the
> regulation will in fact alleviate these harms
> in a direct and material way. . . .
>
> Thus, in applying O'Brien scrutiny we must
> ask first whether the Government has
> adequately shown that the economic health of
> local broadcasting is in genuine jeopardy and
> in need of the protections afforded by must-
> carry.  Assuming an affirmative answer to the
> foregoing question, the Government still
> bears the burden of showing that the remedy
> it has adopted does not "burden substantially
> more speech than is necessary to further the
> government's legitimate interests."  Ward,
> 491 U.S., at 799, 109 S. Ct., at 2758.  On
> the state of the record developed thus far,
> and in the absence of findings of fact from
> the District Court, we are unable to conclude

---

3.  The Supreme Court has recognized that the "O'Brien test 'in
the last analysis is little, if any, different from the standard
applied to time, place and manner restrictions'" like those found
in Renton and Mitchell.  Ward v. Rock Against Racism, 491 U.S.
781, 798 (1959).

21

> that the Government has satisfied either inquiry.

Turner, 114 S. Ct. at 2470.  Justice O'Connor, joined by Scalia, J., and Ginsburg, J., found that the "must carry" rules were not content neutral but agreed that they "fail[ed even] content neutral scrutiny" because:

> "A regulation is not 'narrowly tailored' -- even under the more lenient [standard applicable to content-neutral restrictions] -- where . . . a substantial portion of the burden on speech does not serve to advance [the State's content-neutral] goals."  Simon & Schuster, 502 U.S., at _____ - _____, n.** 112 S. Ct., at 511-512, n.**. . . .

Turner, 114 S. Ct. at 2479.

It may well be that the defendants here, by pointing to studies from other towns and to other evidence of legislative facts, will be able to carry their burden of showing that the ordinance is reasonably designed to address the reasonably foreseeable secondary effect problems.  Nevertheless, our First Amendment jurisprudence requires that the Borough identify the justifying secondary effects with some particularity, that they offer some record support for the existence of those effects and for the Ordinance's amelioration thereof, and that the plaintiffs be afforded some opportunity to offer evidence in support of the allegations of their complaint.  To insist on less is to reduce the First Amendment to a charade in this area.

### B.  The Adequacy of Alternative Channels

Ordinance 31-92, as originally proposed by the Borough Council, prohibited adult entertainment uses located on any land

22

not zoned industrial or in a "buffer zone" -- i.e., less than 1000 feet from a residence or residential zone, school, church, etc. As a result of advice from the Planning Board's engineer that a 1000 foot buffer would leave no land available for an adult bookstore, the Ordinance, as ultimately adopted, called for a 500 foot buffer zone.

At the September 15, 1993, evidentiary hearing, the plaintiffs' expert land use planner, George A. VanSant, testified that the 500 foot version of the ordinance prohibited an adult video store anywhere in the Borough. He tendered a map that depicted the portions of Keyport zoned industrial with superimposed arcs marking 500 feet from each residential property in Keyport and adjacent areas. With respect to the buffers associated with residential properties in adjacent areas, VanSant explained that the Borough's zoning plan had been coordinated with the zoning plans of the contiguous townships and that the buffer provisions of the Ordinance, interpreted in the context of the Borough's zoning ordinance, had to be applied to residential property in contiguous areas.[4] VanSant's map demonstrated that

_____

4. The Supreme Court has suggested that, at least in the case of small municipalities, opportunities to engage in the restricted speech in neighboring communities may be relevant to a determination of the adequate alternative channels. Schad v. Borough of Mount Ephraim, 452 U.S. 61, 76-77 (1981). In Schad, Mount Ephraim, another New Jersey borough, attempted to ban "live entertainment," including nude dancing, within the borough's boundaries. Mount Ephraim asserted that nude dancing was "amply available in close-by areas" within the county. Id. at 76. Nevertheless, the Court concluded that Mount Ephraim could not avail itself of such an argument as there was no county-wide zoning nor any evidence of the availability of nude dancing in "reasonably nearby areas." Id. Here, the Borough does not rely on the availability of "adult entertainment" sites in neighboring

23

the 500 foot buffer left only a portion of two lots available for an adult bookstore.  One of these lots was owned by Jersey Central Power & Light Company and was used as an electric substation.  The other was owned and occupied by a going industrial concern.  VanSant indicated that even if one of these owners could be persuaded to sell or lease, however, neither lot could be used for an adult bookstore because the Borough's zoning ordinance, in accordance with customary zoning practice, defined "use" in such a way that the entirety of each lot takes on the character of the purpose for which any building thereon is utilized.  Thus, the placing of an adult bookstore anywhere on either of these lots would result in a prohibited use within 500 feet of a residential area.

In response to this testimony, the defendants called the Borough's Planning Board engineer, Paul M. Sterbenz.  He testified that the intent of the 500 foot ordinance was to leave four lots in the industrial zone available for an adult bookstore.  He acknowledged, however, that when he reviewed the 500 foot version for the Planning Board he had inadvertently failed to take into account a residential area in adjacent Hazlet Township.  He further acknowledged that when this error was corrected only a portion of two lots were available for an adult bookstore.  Finally, on cross-examination, Sterbenz agreed with VanSant's view that for zoning purposes in the Borough a lot

(..continued)
areas outside its limits; nor has it offered any evidence of such sites.

24

takes on the character of the use to which any portion thereof is put.

Despite this last concession, the defendants' counsel continued to insist that a portion of two lots could be used for an adult bookstore. In support of this position, they called Richard Maser, the Borough Engineer for the Borough of Keyport. He expressed the opinion that an adult bookstore could be constructed on the portion of the two lots that lay outside the 500 foot buffer so long as other set back requirements were met. He did not explain the basis for this opinion, however, and did not comment on VanSant's and Sterbenz's understanding of "use." In response to a question from defense counsel, Maser expressed the further opinion that the Council's original intention of leaving four lots available for an adult bookstore could be accomplished by reducing the buffer zone to 250 feet.

On the evening of June 15th, after the close of the hearing, the Borough Council held a special meeting and adopted a resolution declaring its intention to reduce the buffer zone to 300 feet. It recognized that it could not legally effect the change before the scheduled hearing on September 17th but authorized counsel to advise the court of its intent and to indicate that it considered itself bound to effectuate the change.

At the beginning of the June 17th hearing on the equitable estoppel issue, defense counsel advised the court of the Council's resolution and declared that the amendment would make three lots in their entirety available for an adult

25

entertainment use.  He further indicated that a portion of a fourth lot would be available.  The resolution was marked as an exhibit.  Although the transcript does not affirmatively indicate whether it was formally admitted into evidence, the court and counsel explored the effect of the new ordinance on the map exhibits.  The court clearly indicated that it was considering the resolution as a part of the evidence in the case and that it considered the Borough bound by it.  Counsel for Phillips and Vitale did not at any time object to consideration of the resolution by the court and concluded his closing argument on the issue of alternative access with the following comments concerning three "available" lots:

> There is land that's legally available.  It's occupied by a quasi public entity [and a] manufacturing concern that we can expect that it's going to stay right there, and it's occupied by lot 4, which is basically -- probably a non-buildable ravine, that's it. And I'd submit that when we measure what the Borough has done against what the Supreme Court would permit, and permitted in Young [v. American Theatres] and City of Rentin [sic], that it has substantially restricted access and that it is unconstitutional.

Tr. at 203.

As we have indicated, the district court upheld the constitutionality of the 300 foot Ordinance.  It did not comment upon the constitutionality of the 500 foot Ordinance.  In this appeal, Phillips and Vitale do not argue that the 300 foot ordinance fails to provide constitutionally sufficient alternative channels of expression for adult entertainment.  They do insist that the district court erred in failing to rule upon

26

the constitutionality of the 500 foot Ordinance.  They also contend that the 300 foot Ordinance was not properly before the district court and, alternatively, that it violates the First Amendment, even assuming that it leaves constitutionally sufficient alternative channels of expression for adult entertainment.

We agree with Phillips and Vitale that the district court erred in failing to adjudicate their § 1983 claim that the 500 foot version of Ordinance 31-92 violated their First Amendment rights.  As we have pointed out, the defendants have not tendered record justification for the Ordinance tending to establish that it is narrowly tailored to serve a substantial state interest and the evidence from the June 15, 1993, hearing would provide ample basis for concluding that this version of the Ordinance leaves no alternative channel open for adult entertainment expression.  Contrary to the defendants' suggestion, the issue of the constitutionality of this version of the Ordinance is not moot.  Phillips and Vitale have a § 1983 damage claim based on the 500 foot version of the Ordinance. They seek damages for defendants' refusal to permit them to operate an adult bookstore on Lot 61 from July 28, 1992, when Ordinance 31-92 was first adopted, to the date in the fall of 1993 on which the 300 foot version of the Ordinance was adopted.  If the 500 foot Ordinance is unconstitutional, Phillips and Vitale are entitled to any damages they can establish to have been occasioned by it.

27

As <u>Renton</u>, 475 U.S. 41, 53-54, and <u>Mitchell</u>, 10 F.3d 123, 139, 144, indicate, the existence of adequate alternative channels for adult entertainment expression is an essential element for the state to satisfy when it relies upon its authority to adopt time, place, and manner regulations.[5]  It follows that, on remand, the district court must rule on whether the 500 foot version of the Ordinance left adequate alternative channels for adult entertainment expression.  If the 500 foot version of the Ordinance did not provide adequate alternative channels, the district court should determine what, if any, damages Phillips and Vitale suffered as a result of the adoption of that version of the Ordinance.

Turning to the 300 foot Ordinance, we agree with the defendants that Phillips and Vitale waived their right to complain about the district court's considering that version of the Ordinance.  The record of the June 17th hearing clearly establishes that the district court considered the defendants bound by Council's September 15th resolution and that it intended to consider the 300 foot version of the statute in connection with the plaintiffs' request for injunctive relief.  Plaintiffs' counsel not only failed to object to consideration of that Ordinance, but also assisted the court in understanding its effect on the evidence produced at the September 15th hearing and made a closing argument premised on its adoption.

5.  The defendants have relied entirely on the authority of the Borough to adopt content-neutral time, place, and manner regulations and have not claimed that Ordinance 31-92 can pass muster under strict scrutiny review.

28

On remand, the district court will be required to adjudicate the constitutionality of the 300 foot version of the Ordinance in order to determine Phillips' and Vitale's entitlement to an injunction and to damages arising after its adoption.  Since Phillips and Vitale chose not to appeal from the district court's determination that this version leaves adequate alternative channels for adult expression, the district court need not relitigate that issue in making these determinations.

C.  The Necessity of the Presentation of Pre-Enactment Evidence

While we thus agree with appellants that they are entitled to a reversal of the judgment against them on their First Amendment claim, we reject their argument that they are entitled to a mandate requiring the entry of a judgment in their favor on this claim.  Phillips and Vitale read Renton and our decision in Mitchell as endorsing a per se rule that any governmental regulation of speech is invalid if the adopting entity did not have before it, at the time of adoption, evidence supporting the constitutionality of the action taken.  Thus, in appellants' view, a governmental entity may successfully defend a First Amendment challenge of the kind here mounted only if it can show that it was exposed, before taking action, to evidence from which one could reasonably conclude that undesirable secondary effects would occur in the absence of legislative action and that the particular action taken was narrowly tailored to ameliorate those secondary effects.  We find no such rule in Renton, Mitchell, or any other governing precedent.

There is a significant difference between the requirement that there be a factual basis for a legislative judgment presented in court when that judgment is challenged and a requirement that such a factual basis have been submitted to the legislative body prior to the enactment of the legislative measure. We have always required the former; we have never required the latter. Whatever level of scrutiny we have applied in a given case, we have always found it acceptable for individual legislators to base their judgments on their own study of the subject matter of the legislation, their communications with constituents, and their own life experience and common sense so long as they come forward with the required showing in the courtroom once a challenge is raised. In reliance on this approach, most municipal and county councils throughout the land and some state legislatures do not hold hearings and compile legislative records before acting on proposed legislative measures. We perceive no justification in policy or doctrine for abandoning our traditional approach. Moreover, we believe that insistence on the creation of a legislative record is an unwarranted intrusion into the internal affairs of the legislative branch of governments.

If a legislative body can produce in court whatever justification is required of it under the applicable constitutional doctrine, we perceive little to be gained by incurring the expense, effort, and delay involved in requiring it to reenact the legislative measure after parading its evidence through its legislative chamber. A record like that presented to

the town council in Renton can be easily and quickly assembled,
and a requirement that this be done is unlikely to deter any
municipal body bent on regulating or curbing speech.  While we
agree with appellants that the creation of a legislative record
can have probative value on what the lawmakers had in mind when
they acted, we do not understand why its absence should be
controlling when the court is otherwise satisfied that the
legislative measure has a content-neutral target.

The Supreme Court's Renton case and our Mitchell case
sustained the constitutionality of the ordinances before them.
Renton, 475 U.S. at 54-55; Mitchell, 10 F.3d at 144.  Thus, they
clearly cannot stand for the proposition that a legislative
record is a constitutional prerequisite to validity.[6]  Moreover,
in Mitchell, we expressly reserved this issue, observing that it
was "unnecessary . . . to reach or decide whether . . . a statute

_____

6.  Most of the cases cited by the dissent upheld the ordinances
at issue, and, just as Renton and Mitchell, cannot stand for the
principle that the lack of a legislative record is a fatal
constitutional defect.  National Amusements, Inc. v. Dedham, 43
F.3d 731 (1st Cir.), cert. denied, 115 S. Ct. 2247 (1995);
International Eateries of America, Inc. v. Broward County, 941
F.2d 1157 (11th Cir. 1991), cert. denied, 503 U.S. 920 (1992);
Postscript Enter. v. Bridgeton, 905 F.2d 223 (8th Cir. 1990);
11126 Baltimore Blvd. v. Prince George's County, 886 F.2d 1415
(4th Cir. 1989), vacated on other grounds, 496 U.S. 901 (1990);
Berg v. Health & Hosp. Corp., 865 F.2d 797 (7th Cir. 1989); SDJ,
Inc. v. Houston, 837 F.2d 1268 (5th Cir. 1988); cert. denied, 489
U.S. 1052 (1989).  Although the courts did not sustain the
constitutionality of the ordinances in the other cases cited, in
the course of finding those ordinances invalid, Tollis, Inc. v.
San Bernardino County, 827 F.2d 1329, 1333 (9th Cir. 1987), or
constitutionally suspect, Christy v. Ann Arbor, 824 F.2d 489, 493
(6th Cir. 1987), cert. denied, 484 U.S. 1059 (1988), the courts
focused on the failure of the municipalities to present any
evidence justifying the restrictions rather than on the role of a
legislative record.

passed without any pre-enactment evidence of need or purpose" can be valid.  Id. at 136.

The only case we have been able to find in which an argument has been made similar to the one appellants here advance is Contractors Association v. City of Philadelphia, 6 F.3d 990 (3d Cir. 1993).  That case involved a constitutional challenge to an affirmative action ordinance favoring minorities, women, and disabled persons in the award of city construction contracts. The governing law required that the provisions of the ordinance that drew lines on the basis of race be subjected to strict scrutiny.  Id. at 1000.  Thus, the city was required to show that it had a compelling state interest and that the ordinance was the least restrictive means of serving that interest.  This meant that the city had the burden of producing a strong evidentiary basis for concluding that there had been preexisting discrimination against minorities in which the city had played a role and that the ordinance was necessary to remedy the continuing effects of that discrimination.  Id. at 1001-02.

The plaintiffs in Contractors urged this court to hold that the ordinance was unconstitutional if the City Council did not have before it at the time of the enactment of the ordinance the required evidentiary basis.  We rejected that argument. While we acknowledged that the City Council did not have the required strong evidentiary basis before it at the time it acted, we held that the ordinance could be justified on the basis of evidence acquired thereafter.  Id. at 1003-04.

If we do not insist on a legislative record when we are required to subject a legislative measure to the highest scrutiny, we would be hard-pressed to rationalize insistence on a legislative record when we are, as here, applying a lesser, more deferential standard of constitutionality.

## IV. The Challenge to the Permit Decisions

Appellants contend that their right to substantive due process was violated when their initial permit applications were revoked, when Rhodes, in connection with their subsequent applications, imposed requirements he had not imposed previously, and when Rhodes simply refused to act even after those requirements were met. The actions and delay were allegedly the result of a conspiracy entered into by Rhodes, the Board of Adjustment and the Mayor because of their dislike of the content of the materials appellants intended to sell. The reason given for the revocations (i.e., the erroneous lot numbers) and the new requirements, according to appellants, were simply pretexts to mask a motivation that was wholly unrelated to the merit of their applications. The actions and delay allegedly afforded the Borough an opportunity to adopt Ordinance 31-92, which was then advanced as a reason for the denial of the last application. The district court dismissed the substantive due process count of the complaint for failure to state a claim.

In the course of evaluating these claims, the district court observed that "where there is an explicit textual constitutional provision addressing the alleged wrongs -- as

33

there is here in the form of the First Amendment -- it must be the guide for liability rather than 'the more generalized notion of substantive due process.'" App. at 137. The court did not explain, however, why the allegations of the complaint concerning the period prior to the adoption of Ordinance 31-92 failed to state a claim under First Amendment standards.

The analysis of the district court, as far as it goes, is accurate. It does not follow, however, that these allegations of the complaint fail to state a substantive due process claim upon which relief could be granted.

The right to substantive due process conferred by the Fourteenth Amendment includes the right to be free from state and local government interference with certain constitutionally recognized fundamental rights. Reno v. Flores, 507 U.S. 292, 301-02 (1993); Collins v. Harkes Heights, 503 U.S. 115, 125 (1992); Bowers v. Hardwick, 478 U.S. 186, 191 (1986). As we have noted in connection with the challenge to the Ordinance, among these fundamental rights are the rights expressly recognized by the First Amendment in the context of federal government interference.[7] Thus, where a state or local official has

---

7. The constitutional basis is the same for both the challenge to the Ordinance and the challenge to the permit decisions. Both, in theory, are substantive due process claims governed by First Amendment standards because of the rights allegedly infringed. The district court's reference to "the more generalized notion of substantive due process" may be attributable to the fact that Phillips and Vitale rely, in addition to First Amendment jurisprudence, on a line of our cases relating to adjudicative decisions not alleged to have infringed fundamental rights. E.g., Bello v. Walker, 840 F.2d 1124 (3d Cir.), cert. denied, 488 U.S. 851, and cert. denied, 488 U.S. 868 (1988); Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667 (3d Cir. 1991), cert. denied, 503 U.S. 984 (1992); Parkway

34

(..continued)
Garage, Inc. v. City of Philadelphia, 5 F.3d 685 (3d Cir. 1993); DeBlasio v. Zoning Bd. of Adjustment of West Amwell, 53 F.3d 592 (3d Cir.), cert. denied, 116 S. Ct. 352 (1995); Blanche Road Corp. v. Bensalem Township, 57 F.3d 253 (3d Cir.), cert. denied, 116 S. Ct. 303 (1995). As the defendants point out, these cases are arguably at odds with some decisions in other circuits. See, e.g., Nestor Colon Medina & Sucesores v. Custodio, 964 F.2d 32 (1st Cir. 1992); Shelton v. City of College Station, 780 F.2d 475 (5th Cir.) (en banc), cert. denied, 477 U.S. 905, and cert. denied, 479 U.S. 822 (1986). Phillips and Vitale claim that the decisions to deny or delay their permits were based on a distaste for the content of their speech. The relevant allegations of the complaint read as follows:

60. In particular, but without limitation, the Defendants have:

(a) purported to require Phillips and Vitale to obtain a zoning permit notwithstanding that they proposed no erection, construction or structural alteration, and accordingly, no such permit is required by Ord. 25:1-20;

(b) revoked the zoning permit issued to them on about March 10, 1992, purportedly because of misidentification of the property, notwithstanding that Rhodes first physically inspected the subject property; was under no misapprehension as to location or any particular with respect to the property, and would have issued the permit had the property been properly identified;

(c) processed and otherwise dealt with Phillips' and Vitale's second and third zoning permit applications, critically and unfavorably because of the Defendants' distaste for adult-theme materials;

(d) purposely delayed action on Phillips' and Vitale's third zoning permit application so as to permit the Borough Council an opportunity to introduce and adopt an Adult Entertainment Use Ordinance, the requirements of which would render Phillips' and Vitale's use a prohibited use in a Highway Commercial District; and

(e) applied an unconstitutional ordinance to Phillips and Vitale with a purpose to restrain their sale, rental, exchange and exhibition of adult-theme videos, as well as

35

prevented or punished constitutionally protected expression

because of distaste for the content of that expression, there is

(..continued)
        adult books, magazines and the like <u>because</u>
        <u>of their content</u>.

The only improper motivation alleged here is thus distaste for
the content of the speech involved.  Because this case involves
only alleged infringements of the right to free expression, the
standard of liability articulated in the above-cited cases is
inapposite here.

substantive due process liability unless the defense can show that the action taken satisfies the strict scrutiny test prescribed in the First Amendment cases or that the same action would have been taken in any event for reasons unrelated to the expression.  E.g., Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle, 429 U.S. 274 (1971) (if failure to renew a teacher was motivated by his exercise of his First Amendment rights and he would otherwise have been renewed, there is a violation of the Fourteenth Amendment); Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503 (1969) (students disciplined for wearing arm bands had their constitutional rights violated if motive was disapproval of message); Board of Ed., Island Trees Union Free Sch. Dist. v. Pico, 457 U.S. 853 (1982) (removing books from library motivated by content disapproval rather than legitimate educational concerns).

In Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32 (1st Cir. 1992), the plaintiffs had been denied a land use permit for the construction of a "tourist residential complex" in Puerto Rico.  The plaintiffs included Dr. Maximo Cerame Vivas, an outspoken member of an opposition party and a critic of the government's environmental policies.  The plaintiffs alleged that the permit had been denied in retaliation for Cerame Vivas's expressions of his political views.  The court reversed a summary judgment in the defendants' favor.  It held that to "the extent Cerame Vivas's substantive due process claim [was] based on the alleged retaliation for his political views," it should be evaluated by First Amendment standards.  Id. at 46.

After noting the Supreme Court's holding in <u>Mt. Healthy</u>, the court concluded that the "same general principle would apply to a retaliatory refusal to grant a permit", <u>id.</u> at 41, and concluded that the plaintiffs' evidence was sufficient to permit an inference that land use planning concerns were but a pretext to mask a retaliatory motive.

We conclude that Phillips and Vitale have alleged facts that, if proven, could serve as a predicate for a recovery on their claim involving permit denial, delay and revocation. Contrary to the defendants' argument, it seems clear to us from the face of the Borough's zoning ordinance at the time of their first application that the proposed use of Lot 61 was a permitted use in a commercial zone. While the revocation of Phillips' and Vitale's permits purported to rest on the fact that the authority conferred by the permits was for Lot 59, which was in a residential zone, the complaint alleges that everyone had a common understanding that Lot 61 was the lot in question and that, but for their dislike of the content of the proposed adult entertainment expression, Rhodes or the Board of Adjustment would have corrected the lot number on the permits and affirmed the authority which Rhodes intended to grant. Similarly, the complaint alleges that Rhodes and the Mayor interfered with the processing of the second and third applications solely because of their antipathy toward the content of the materials Phillips and Vitale intended to market.

Under these circumstances, we conclude that the district court was in error when it granted the motions to

38

dismiss the permit claim and that the case must be remanded for further proceedings on that claim.

We offer one additional observation to assist the district court in the further proceedings on this claim. We find nothing improper in a good-faith decision by an authorized public official to delay action on all applications for authority that would be affected by a proposed amendment to the governing ordinance in order to allow a reasonable time for a legislative body to consider and vote on the proposal. Thus, if a public official authorized by local law to impose a moratorium on the issuance of permits imposed such a moratorium for the purpose of allowing the municipality a reasonable opportunity to consider whether the secondary effects of adult entertainment uses required additional zoning regulation, any resulting delay could not constitute a substantive due process violation. It is by no means clear, however, that this is what happened here. As the record develops, it may be that the trier of fact will reasonably conclude that the delay occasioned by Rhodes or the Mayor was occasioned not by concern for what the Borough Council might determine to be undesirable secondary effects, but rather by distaste for the sexually explicit material, as Phillips and Vitale allege. The crucial difference in the two situations is the propriety of the motivation of the official causing the delay.

V.  The Claim for Litigation Expenses under 42 U.S.C. § 1988

39

It follows from the foregoing discussion that Phillips and Vitale may prevail on some or all of their federal claims. To the extent they prevail on those claims, they will be entitled to an award of reasonable costs and counsel fees under 42 U.S.C. § 1988.[8]

## VI.  The Equitable Estoppel Claim

Finally, Phillips and Vitale argue that the Borough is equitably estopped under New Jersey law from revoking the zoning permit issued by Rhodes on March 9, 1992, and the construction permits issued on March 18th.  Specifically, they contend that they reasonably relied on those permits to their detriment by entering into the lease and by "beg[inning] to renovate the property in order to prepare it for their contemplated use" after receiving construction, electrical, and plumbing permits.

---

8.  Phillips and Vitale argue that they should be entitled to an award of the counsel fees they paid in connection with their efforts to enjoin the 500 foot Ordinance even if they can prove no compensable damage from that Ordinance and even if they lose on their other federal claims.  Their contention is based on the following "catalyst theory":  (a) the Borough adopted an unconstitutional 500 foot Ordinance and relied upon it to deny their application for a permit; (b) they challenged this Ordinance and demonstrated at an evidentiary hearing that it suppressed adult entertainment expression altogether; (c) as a result of their suit and their demonstration, the Borough Council repealed the 500 foot Ordinance; and (d) accordingly, they are "prevailing parties" under § 1988 at least to this limited extent.  See, e.g., Baumgartner v. Harrisburg Housing Authority, 21 F.3d 541 (3d Cir. 1994); Dunn v. United States, 842 F.2d 1420, 1433 (3d Cir. 1988).  Because the district court failed to address this "catalyst theory" and because it may ultimately be unnecessary to resolve the issues thus raised if Phillips and Vitale are otherwise successful, we express no view on those issues.

40

Appellants' Brief at 38. Without the zoning permit, they allege, they would have done neither.

The district court rejected this argument in the course of denying Phillips' and Vitale's motion for summary judgment. It concluded that, under Lizak v. Faria, 476 A.2d 1189 (N.J. 1984), Phillips and Vitale could not demonstrate good faith reliance on the initial zoning permits and, accordingly, were not entitled to assert a claim of equitable estoppel. On appeal, Phillips and Vitale argue, inter alia, that Lizak is distinguishable and that they did rely in good faith on Rhodes' initial determination.

The doctrine of equitable estoppel is well established in New Jersey.
To establish a claim of equitable estoppel, the

> claiming party must show that the alleged
> conduct was done, or representation was made,
> intentionally or under such circumstances
> that it was both natural and probable that it
> would induce action. Further, the conduct
> must be relied on, and the relying party must
> act so as to change his or her position to
> his or her detriment.

Miller v. Miller, 478 A.2d 351, 355 (N.J. 1984); see Carlsen v. Masters, Mates & Pilots Pension Plan Trust, 403 A.2d 880, 882-83 (N.J. 1979). "A prerequisite of equitable estoppel" is that such reliance be in "good faith." Lizak, 476 A.2d at 1198. "The doctrine of equitable estoppel is applied 'only in very

41

compelling circumstances,' 'where the interests of justice, morality and common fairness clearly dictate that course.'" Palatine I v. Planning Bd. of Township of Montville, 628 A.2d 321, 328 (N.J. 1993) (citations omitted). In particular, "equitable estoppel is rarely invoked against public entities, although it may be invoked to prevent manifest injustice." W.V. Pangborne & Co., Inc. v. New Jersey Dep't of Transportation, 562 A.2d 222, 227 (N.J. 1989); see O'Malley v. Dep't of Energy, 537 A.2d 647, 650-51 (N.J. 1987).

In Lizak, the Farias had applied for a zoning variance. 476 A.2d at 1191-93. After opposition from nearby residents, the Woodbridge Township Board of Adjustment denied the variance. Id. at 1191. However, the board failed to record its determination in writing. As a result the Farias, under New Jersey law, were entitled to an automatic grant of the variance. Id. at 1192. A day after the Woodbridge Municipal Clerk certified the grant of the variance, the Farias obtained a building permit, and ten days later they began construction. Within a month, the exterior of the building was completed at an estimated expense of $60,000, almost one-half of the estimated cost of the project. When a nearby resident realized what was happening, she filed an appeal to the Township Council seeking revocation of the variance and the permit and an order directing the removal of the construction. The Farias responded that they had relied on the issuance of a valid building permit in proceeding with the construction and that the municipality was

42

equitably estopped from ordering the removal of the existing structure.  Id. at 1193.

The New Jersey Supreme Court rejected the Farias' argument.  Id. at 1198-99.  After noting that good faith reliance is a prerequisite of equitable estoppel, the court explained:

> The Farias' conduct . . . does not so much bespeak good faith reliance as it reveals a "hasty effort to attempt to acquire an unassailable position to which [they] equitably should not be entitled."  They knew that their neighbors objected to the proposal and that the Board had orally disapproved their application.  Consequently, they reasonably could have expected further opposition to the construction.  They chose to rely on the advice of counsel that the Board's failure to reduce its decision to writing converted its oral denial into a statutory grant.  Although that advice was correct as far as it went, the Farias' failure to publish a notice of approval left the variance subject to appeal for a reasonable time.  In relying on their attorney's opinion while the underlying variance was still appealable, they took their chances.  They should not now be heard to complain.

Id. at 1198 (citation omitted).

Phillips and Vitale, in this appeal, urge that there is a world of difference between their circumstances and those of the Farias.  However, we reject appellants' effort to limit Lizak to its admittedly egregious facts.  The driving force in that case was that parties who proceed with construction while their permits are still appealable "[take] their chances."  Id.  As the trial court in Lizak explained,

> their reliance can not convert the permit into
>
> something not subject to administrative and
>
> judicial review.  They could not reasonably

43

have relied upon the inviolability of
municipal actions that were still subject to
appeal.  The . . . construction official's
action assured [the Farias] that a permit was
issuable, but not that [it] was not
appealable.

Lizak v. Faria, 434 A.2d 659, 664 (N.J. Super. 1981).

To sustain appellants' position here would eviscerate
the appellate process in land use applications.  It would
encourage recipients of zoning permits to launch into large-scale
construction or renovation so as to present municipal authorities
with a fait accompli before other affected parties have exhausted
their opportunities to challenge the permit.  We believe these
considerations support the clear mandate of the highest court in
New Jersey in Lizak.


## VII.  Conclusion

The judgment of the district court will be reversed and
the case will be remanded for further proceedings consistent with
this opinion.

Phillips v. Borough of Keyport

No. 95-5143

ALITO, Circuit Judge, concurring and dissenting.

I join all but part IV of the opinion of the court. As I read the plaintiffs' complaint, it asserts a substantive due process claim under a line of panel decisions that stems from Bello v. Walker, 840 F.2d 1124 (3d Cir.), cert. denied, 488 U.S. 851 and 868 (1988). See also Blanche Road Corp. v. Bensalem Township, 57 F.3d 253, 268 (3d Cir.), cert. denied, 116 S.Ct. 303 (1995); DeBlasio v. Zoning Board of Adjustment, 53 F.3d 592, 599-601 (3d Cir.), cert. denied, 116 S.Ct. 352 (1995); Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 683 (3d Cir. 1991), cert. denied, 503 U.S. 984 (1992). Bello and the subsequent panel decisions -- which followed Bello, as was of course required -- seem to hold that substantive due process is violated whenever a government official who harbors "some improper motive," Midnight Sessions, Ltd., 945 F.2d at 683, deprives a person of certain property rights, apparently including the unrestricted use of the person's real estate. See DeBlasio, 53 F.3d at 600-01.

Under these decisions, the plaintiffs could prevail on remand by showing simply that the defendants deprived them of a protected property interest for some "improper motive"; a motive that is violative of the First Amendment would not have to be shown. As the plaintiffs stated in their brief, under Bello,

45

"[i]n the land use context, . . . [w]here there is a deliberate and arbitrary abuse of government power, an individual's right to substantive due process may be violated."

Rather than applying (and thus reaffirming) Bello and its progeny, the majority has transformed the plaintiffs' Bello claim into what is in essence a First Amendment claim,[9] and the majority thus requires them to show on remand that the defendants harbored an intent that was violative of the First Amendment. This narrowing interpretation of the complaint is not proper in an appeal from an order of dismissal under Fed. R. Civ. P. 12 (b)(6), but this approach permits the majority to evade the question whether Bello was correct.

Since the plaintiffs have asserted a Bello claim, I think that the in banc court should confront the question whether Bello remains good law. If it does, the full court should not be hesitant to reaffirm it. But if -- as the court's approach here signals -- the in banc majority is uncertain about Bello's validity, the court should not skirt the issue. The question is properly before us; Bello and its progeny are important decisions that are invoked with some frequency; and a resolution of the validity of these precedents as components of circuit law would

_____

9.To be sure, as the majority notes, the substantive component of the Fourteenth Amendment's Due Process Clause incorporates specific guarantees set out in the Bill of Rights, including the right to freedom of speech and of the press protected by the First Amendment, and therefore in this sense every free speech claim challenging a state action is a substantive due process claim. But this aspect of the substantive component of due process is very different from the aspect of substantive due process on which Bello was based.

be useful to the district courts and the bar.  The majority's approach, which leaves these decisions in limbo, may lead to much wasted litigation before the district courts and before panels of this court, which are of course bound by <u>Bello</u> until it is overruled by the in banc court or by the Supreme Court.

As I have previously suggested, see <u>Homar v. Gilbert</u>, 89 F.3d 1009, 1029-30 (3d Cir. 1996) (Alito, J., concurring in part and dissenting in part), <u>cert. granted on other issue</u>, 117 S.Ct. 678 (1997), I think that <u>Bello</u> was wrong and was based on a misreading of Supreme Court precedent.  In <u>Bello</u>, the plaintiffs claimed that certain municipal officials had "improperly interfered with the process by which the municipality issued building permits, and that they did so for partisan political or personal reasons unrelated to the merits of the application for the permits."  840 F.2d at 1129.  The panel held that "[t]hese actions . . . if proven, are sufficient to establish a substantive due process violation.    . . ."  <u>Id</u>. at 1129-30.

The panel wrote:

> The Supreme Court has discussed the scope of the substantive due process right in a number of recent cases.  In <u>Daniels v. Williams</u>, 474 U.S. 327, 106 S.Ct. 662, 88 L. Ed. 2d 662 (1986), the Court, in holding that the due process clause was not implicated by a state's negligent deprivation of life, liberty or property, pointed out that the guarantee of due process has historically been applied to deliberate decisions of government officials.  <u>Id</u>. at 331, 106 S.Ct. at 665.  The Court noted that the clause was "`"intended to secure the individual from the arbitrary exercise of the powers of government,"'" <u>id</u>. (quoting <u>Hurtado v. California</u>, 110 U.S. 516, 527, 4 S.Ct. 111, 116, 28 L. Ed. 232 (1884) (quoting <u>Bank of Columbia v. Okely</u>, 4 Wheat. (17 U.S.) 235, 244, 4 L. Ed. 559 (1819))), and distinguished the <u>Daniels</u> case from cases involving an abuse of power.

47

In the related case of Davidson v. Cannon, 474 U.S. 344, 106 S.Ct. 668, 88 L. Ed. 2d 677 (1986), the Court held that mere negligence on the part of a state does not amount to an abuse of state power such that constitutional due process is implicated. Justice Blackmun, dissenting, noted that he agreed with the majority's conclusion that a "deprivation must contain some element of abuse of governmental power, for the `touchstone of due process is protection of the individual against arbitrary action of the government.'" Id. at 353, 106 S.Ct. at 673 (quoting Wolff v. McDonnell, 418 U.S. 539, 558, 95 S.Ct. 2963, 2975, 41 L. Ed. 2d 935 (1974). See also Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 263, 97 S.Ct. 555, 562, 50 L. Ed. 2d 450 (1977) (constitutional due process right to be free of arbitrary or irrational zoning action); Pace Resources, Inc. v. Shrewsbury Twp., 808 F.2d 1023, 1034-35 (3d Cir.), cert. denied, [482 U.S. 906], 107 S.Ct. 2482, 96 L. Ed. 2d 375 (1987) (to demonstrate violation of right to substantive due process, plaintiff must show that land use regulation was arbitrary or irrational). These cases reveal that the deliberate and arbitrary abuse of government power violates an individual's right to substantive due process.

840 F.2d at 1128-29.

In my view, this analysis is clearly flawed. In the first place, neither Daniels v. Williams, supra, nor Davidson v. Cannon, supra, provides much guidance on substantive due process since neither was a substantive due process case. Instead, both concerned procedural due process. In Daniels, the plaintiff was an inmate who alleged that he had slipped and fallen on a pillow that had been left on the stairs by a correctional deputy. The Supreme Court summarized his constitutional claim as follows:

[The deputy's] negligence, the argument runs, "deprived" [the plaintiff] of his "liberty" interest in freedom from bodily injury . . . ; because [the deputy] maintains that he is entitled to the defense of sovereign immunity in a state tort suit, [the plaintiff] is without an "adequate" state remedy . . . . Accordingly, the deprivation of liberty was without "due process of law."

474 U.S. at 328.

48

This was plainly a procedural, not a substantive, due process claim. Substantive due process bars certain government actions irrespective of the fairness of the procedures used to implement them, <u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 125 (1992), and the plaintiff in <u>Daniels</u> was not arguing that his due process rights would have been violated even if fair procedures had been available (i.e., even if he had been able to obtain a complete recovery for his damages) under state law. Rather, he was contending that the deprivation of his liberty interest was "without due process of law" because the state did not provide adequate post-deprivation procedures.

Similarly, the plaintiff in <u>Davidson</u> asserted a procedural, not a substantive, due process claim. In that case, the plaintiff was an inmate who claimed that prison officials had negligently failed to protect him from a fellow inmate who attacked him. The Court wrote:

[The plaintiff] emphasizes that he "does not ask this Court to read the Constitution as an absolute guarantor of his liberty from assault from a fellow prisoner, even if that assault is caused by the negligence of his jailers." Brief for Petitioner 17. Describing his claim as "<u>one of procedural due process, pure and simple</u>," <u>id.</u>, at 14, all he asks is that [the state] provide him a remedy.

474 U.S. at 348 (emphasis added).

Justice Stevens' concurrence also emphasized that the claims in both <u>Daniels</u> and <u>Davidson</u> concerned procedural, not substantive, due process. He wrote:

I do not believe petitioners have raised a colorable violation of "substantive due process." <u>16/</u> Rather, . . . Daniels and Davidson attack the validity of the procedures that Virginia and New Jersey, respectively,

49

provide for prisoners who seek redress for physical injury caused by the negligence of corrections officers.

16/ Davidson explicitly disavows a substantive due process claim. See Brief for Petitioner in No. 84-6470, p.7 ("[P]etitioner frames his claim here purely in terms of procedural due process"). At oral argument, counsel for Daniels did suggest that he was pursuing a substantive due process claim. Tr. of Oral Arg. in No. 84-5872, p. 22. However, the Court of Appeals viewed Daniels' claim as a procedural due process argument, see 748 F.2d 229, 230, n.1 (CA4 1984) ("There is no claim of any substantive due process violation"), and Daniels did not dispute this characterization in his petition for certiorari or in his brief on the merits. . . .

474 U.S. at 340 & n.16. Thus, it seems clear that neither Daniels nor Davidson was a substantive due process case.

Moreover, neither Daniels nor Davidson provided any extended or novel discussion of substantive due process. Daniels devoted one sentence to the topic, see 474 U.S. at 331-32, and Davidson did not mention it at all.

Despite the fact that Daniels and Davidson were not substantive due process cases and had little to say about substantive due process, Bello used them as the basis for an important substantive due process holding. From them, Bello extracted the unremarkable proposition that the constitutional guarantee of due process was intended to protect the individual against the arbitrary exercise of government power, and Bello then reasoned that "the deliberate and arbitrary abuse of government power violates an individual's right to substantive due process." 840 F.2d at 1129. This reasoning overlooked the fact that the primary means by which due process protects against

50

the arbitrary exercise of power by government officials is by requiring fair procedures, i.e., by requiring adherence to principles of procedural due process. Only in extreme circumstances is it proper to invoke substantive due process.

In addition to Daniels and Davidson, Bello cited, in support of its substantive due process analysis, one other Supreme Court case, Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 263 (1977), and one Third Circuit case, Pace Resources, Inc. v. Shrewsbury Twp., 808 F.2d 1023, 1034-35 (3d Cir.), cert. denied, 482 U.S. 906, reh'g denied, 483 U.S. 1040 (1987). However, Bello seems to have misinterpreted these decisions in an important respect. Arlington Heights and Pace Resources stand for the principle that a zoning ordinance violates substantive due process if the zoning authority could not have had a rational basis for adopting it. As Pace explained, "`federal judicial interference with a state zoning board's quasi-legislative decisions, like invalidation of legislation for "irrationality" or "arbitrariness," is proper only if the governmental body could have had no legitimate reason for its decision.'" 808 F.2d at 1034 (citation omitted) (emphasis added in Pace). Pace did not suggest that a plaintiff could state a valid substantive due process claim merely by alleging that an ill-motivated government official had interfered with the plaintiff's use of his or her real estate. On the contrary, Pace held that the challenged government actions in that case did not violate substantive due process even though a state court had found them to be "`arbitrary and unjustifiably

51

discriminatory.'" Id. at 1028, 1034 (citation omitted). Furthermore, Pace quoted with approval a First Circuit case, Creative Environments, Inc. v. Estabrook, 680 F.2d 822 (1st Cir.), cert. denied, 459 U.S. 989 (1982), which stated that a "conventional planning dispute," "regardless of . . . defendants' alleged mental states," does not implicate substantive due process, "at least when not tainted with fundamental procedural irregularity, racial animus, or the like." Id. at 833 (emphasis added).

Bello, however, took the highly deferential, objective test set out in Arlington Heights and Pace -- whether the zoning authority could have had a rational basis for its action -- and turned it into a subjective test of good faith, i.e., whether municipal officials' actions in connection with land use matters were taken for "partisan political or personal reasons unrelated to the merits of the application for the permits." 840 F.2d at 1129. This was a significant step, see 2 Ronald D. Rotunda and John E. Nowak, Treatise on Constitutional Law § 15.4 at 415 n.60 (1992 & 1996 Supp.), and the Bello court did not provide any explanation for it.

The Supreme Court has stated: "As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking are scarce and open-ended. . . . The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." Collins, 503 U.S. at 125. However, Bello broke new ground,

52

without acknowledging that it was doing so, and I see nothing in Bello or the cases that have followed it that convinces me that every ill-motivated governmental action that restricts the use of real estate constitutes a violation of substantive due process. Most of the serious abuses that occur in this area, such as instances of invidious discrimination, can be redressed by other means, in either federal or state court or both. Under Bello and its progeny, however, mundane land-use disputes that belong in state court are transformed into substantive due process claims cognizable under 42 U.S.C. § 1983. In addition, these precedents may well be extended to other fields, such as public employment, see e.g., Homar v. Gilbert, 89 F.3d at 1021; id. at 1026-28 (Alito, J., concurring in part and dissenting in part). I would curtail this trend and would overrule Bello and the cases that followed it. See Chesterfield Dev. Corp. v. City of Chesterfield, 963 F.2d 1102, 1104-05 (8th Cir. 1992) (holding that allegations that city arbitrarily applied zoning ordinance were insufficient to state a substantive due process claim, and stating in dicta that "[o]ur decision would be the same even if the City had knowingly enforced the invalid zoning ordinance in bad faith . . . . A bad-faith violation of state law remains only a violation of state law."); PFZ Properties, Inc. v. Rodriguez, 928 F.2d 28, 32 (1st Cir. 1991) ("Even assuming that ARPE engaged in delaying tactics and refused to issue permits for the Vacia Talega project based on considerations outside the scope of its jurisdiction under Puerto Rico law, such practices, without more, do not rise to the level of violations of the federal

constitution under a substantive due process label."), <u>cert. dismissed</u>, 503 U.S. 257, <u>reh'g denied</u>, 504 U.S. 935 (1992); <u>Rivkin v. Dover Tp. Rent Leveling Bd.</u>, 143 N.J. 352, 371, 671 A.2d 567, 577 (holding that substantive due process was not violated when rent leveling board member acted in biased manner, and disagreeing with <u>Bello</u> because "we seriously doubt that the Supreme Court will find a substantive due process violation to exist when a governmental body denies a property right by conduct that is 'arbitrary or irrational' under state law but neither shocking to the conscience of a court in the sense of being a departure from civilized norms of governance, nor offensive to human dignity") (citation omitted), <u>cert. denied</u>, 117 S.Ct. 275 (1996).

Thus, while I would remand the plaintiffs' First Amendment claim, both with respect to the defendants' pre- and post-ordinance conduct, I would affirm the dismissal of the plaintiffs' substantive due process claim.

Phillips, et al. v. Borough of Keyport, et al.
No. 95-5143


ROSENN, Circuit Judge, dissenting.

Although I agree with the majority's analysis of the facts and much of the law, I differ with them with respect to Part III (C), "The Necessity of Pre-Enactment Evidence." The majority concludes that a municipality may constitutionally enact an ordinance restricting the expression of speech without any legislative record before it justifying such restrictions. I believe that the Borough of Keyport's failure to articulate at the time of enactment any governmental interest justifying its ordinance No. 31-92, designed to curb protected speech expression, is a fatal constitutional defect. The defect cannot be cured by allowing the municipality to structure a post hoc record more than four years later and then after judicial review by a trial and appellate court.


I.

The majority and I agree that speech, whether in the form of film, print, or live presentations, though sexually explicit in content but not obscene, is protected under the First Amendment. Maj. op. at 14-16. We further agree that when a legislative body acts to regulate speech on the basis that its action serves a substantial, content-neutral state interest, as Keyport Borough did in this case, it must come forward with evidence of adverse social effects that justify reasonable time,

55

place, and manner restrictions on speech or expressive conduct; the municipality must support its position "with a reasoned and substantial basis demonstrating the link between the regulation and the asserted governmental interest." Maj. op. at 16, quoting Mitchell v. Commission on Adult Entertainment, 107 F3d 123, 132 (3d Cir. 1993). It is undisputed that Keyport Borough failed this indispensable requirement. It is also undisputed that the district court sustained the constitutionality of the Keyport ordinance which substantially burdened the exercise of protected speech "without a record supporting the reasonableness of any legislative expectations" that warranted its findings pertaining to the likelihood of secondary effects and the ameliorative effect of the ordinance.

> [W]e do not yet know how the Borough will seek to justify the ordinance. There is no articulation by the state of what it perceives its relevant interests to be and how it thinks they will be served. This is particularly troublesome in a case like this, where the legislative findings speak in terms of "serious objectionable operational characteristics," "deleterious effects," and "the deterioration of the community" without identifying in any way those [considerations].

Maj. op. at 18.

Where we part company, however, is that the majority, in the face of a decision of the Supreme Court and decisions of a substantial number of United States courts of appeals to the contrary, holds today that a legislative body need have no record before it at the time of enactment justifying an ordinance

56

regulating protected speech.  Although I fully empathize with the efforts of the Borough of Keyport to preserve a wholesome quality of community life, I cannot lend my support to the majority's potentially dangerous disregard of an established safeguard in protection of cherished First Amendment rights, namely, a record at the time of enactment justifying the restrictive regulation of protected speech.

There is no question that local legislative bodies are to be afforded great deference when it comes to zoning matters. Rogin v. Bensalem Township, 616 F.2d 680, 698 (3d Cir. 1980). The Supreme Court, however, has made clear that the latitude generally afforded legislatures may be narrowed when First Amendment concerns are at stake.  See, e.g., Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 843 (1977). Although sexually oriented materials are due less protection than other forms of expression, Young v. American Mini Theatres, 427 U.S. 50, 70 (1975), their regulation by zoning nonetheless triggers a heightened level of scrutiny.  Courts have reconciled respect for local land regulation concerns with the protection of speech by requiring that municipalities impose restraints on adult entertainment establishments only where there is evidence that they have deleterious "secondary effects" upon the adjacent areas.  Id. at 71 n.4.

Although adult entertainment establishments may provide a form of entertainment that is not without any First Amendment protection from municipal authority, see Schad v. Mt. Ephraim, 452 U.S. 61, 65 (1980); American Mini Theatres, 427 U.S. at 59,

57

the majority's position that the evidence may be developed at any time after the zoning enactment until challenged in court runs counter to the purpose of such an evidentiary requirement, the view taken by the Supreme Court in City of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986), and by virtually every other circuit in this country.

We are not free to ignore the purpose of the requirement and the binding precedent. Thus, I find the majority view on this issue unacceptable. The majority makes several sweeping statements to the effect that this court has "never" required more of a municipality than it make the required showing once a challenge to legislation is raised. It ignores the significance of the timing for the evidentiary record to justify the restrictive impositions of speech; if speech is to be so restricted, the justification should be stated at the time of enactment so that appropriate judicial scrutiny might be made. The majority offers no support whatsoever for its statements, and I do not believe such support exists in our precedents with respect to the regulation of protected speech.

Renton stands only for the proposition that a municipality need not conduct its own pre-enactment studies (i.e., that it may rely on studies conducted by other communities). The unavoidable inference from Renton is that the municipality must rely upon something at the time of enactment justifying its action limiting freedom of speech. The various courts of appeals, including our own in Mitchell, supra, have emphasized the Supreme Court's statement that

[t]he First Amendment does not require a city, <u>before enacting</u> such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, <u>so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses</u>.

<u>Renton</u>, 475 U.S. at 51-52 (emphasis added). Accordingly, not a single court of appeals has interpreted <u>Renton</u> as requiring absolutely no pre-enactment evidence.[10] The position adopted by the majority leaves the Third Circuit an outlier among the United States courts of appeals.

The majority asserts that because <u>Renton</u> and <u>Mitchell</u> sustained the constitutionality of the ordinances before them, they cannot stand for the proposition that a legislative record is a constitutional prerequisite to validity. I strongly disagree. Both the <u>Renton</u> Court and the <u>Mitchell</u> court leave no doubt that pre-enactment evidence is indeed a constitutional requirement; the courts sustained the ordinance in question because they were satisfied that the enacting body had sufficient evidence before it. See <u>Renton</u>, 475 U.S. at 51-52; <u>Mitchell</u>, 10 F.3d at 134-35.

The majority also maintains that in <u>Mitchell</u>, this court expressly reserved the issue of whether pre-enactment evidence is necessary. Again, I disagree. <u>Mitchell</u> plainly

─────────────────────────

10.The Supreme Court itself, in a case decided four years after <u>Renton</u>, seems to assume that at least some pre-enactment evidence <u>is</u> required in this type of case. "We agree with the Court of Appeals that the reasonableness of the legislative judgment, <u>combined with the Los Angeles study</u>, is adequate to support the city's determination . . .." <u>FW/PBS, Inc. v. Dallas</u>, 493 U.S. 215, 236 (1990) (emphasis added).

requires such evidence.  The skillful use of ellipses ought not to allow us to circumvent binding precedent.  The majority asserts that Mitchell says that it was "unnecessary . . . to reach or decide . . . whether a statute passed without any pre-enactment evidence of need or purpose" can be valid.  The full quotation, sans ellipsis, makes quite a different point.  It reads:  "Here, it is unnecessary for us to reach or decide whether the doctrine of legislative notice of the incidental activities common to adult book stores can save a statute passed without any evidence of pre-enactment evidence of need and purpose."  Mitchell, 10 F.3d at 136 (emphasis added).

We are thus bound by both Supreme Court precedent and the precedent of our own circuit to require at least some evidence at the time of adoption before we sustain a restrictive ordinance of the type currently before us.  The majority is of the view that the legislative body need have no factual basis before it at the time of the enactment of the ordinance, and that such a requirement is only necessary when the legislative judgment is challenged in court.  Maj. op. at 30.  If we look to cases decided in our sister circuits, we also see that no other circuit in this country has espoused the extreme, and I believe incorrect, position taken by the majority.  Cases similar to the one at bar have been decided in the First, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits.[11]  Every one of

---

11.National Amusements, Inc. v. Dedham, 43 F.3d 731, 742 (1st Cir.) (stating that a legislative body may rely on whatever pre-enactment evidence it considers to be relevant), cert. denied, 115 S. Ct. 2247 (1995); 11126 Baltimore Blvd. v. Prince George's County, 886 F.2d 1415, 1421-23 (4th Cir. 1989) (finding pre-

60

these circuits has interpreted Renton to require pre-enactment evidence, and every one of these circuits has insisted upon such evidence before affirming the constitutionality of a restrictive zoning ordinance.

The majority argues that most of the cases I cite from other circuits sustained the ordinance and "therefore cannot stand for the principle that the lack of a legislative record is a fatal constitutional defect." Maj. op. at 32, n. 6. Those ordinances that were sustained, however, did have legislative records at the time of their enactment. Those held constitutionally defective, Tollis, Inc. v. San Bernardino County, 827 F.2d. 1329 (9th Cir. 1987), or constitutionally

(..continued)
enactment evidence of secondary effect "sufficient under Renton to withstand a constitutional challenge"), vacated on other grounds, 496 U.S. 901 (1990); SDJ, Inc. v. Houston, 837 F.2d 1268, 1274 (5th Cir. 1988) ("We are persuaded that the City met its burden under City of Renton to establish that there was evidence before it from which the Council was entitled to reach its conclusion . . .."), cert. denied, 489 U.S. 1052 (1989); Christy v. Ann Arbor, 824 F.2d 489, 493 (6th Cir. 1987) ("Although both the Supreme Court in Renton and the Sixth Circuit . . . have stated that a city need not conduct new independent studies to justify adult business zoning ordinances, both courts have required some relevant evidence to demonstrate that the zoning ordinance was intended to address the secondary effects of adult businesses"), cert. denied, 484 U.S. 1059 (1988); Berg v. Health & Hosp. Corp., 865 F.2d 797, 803-04 (7th Cir. 1989) (detailing the pre-enactment evidence and testimony upon which governmental body relied); Postscript Enter. v. Bridgeton, 905 F.2d 223, 227 (8th Cir. 1990) (upholding an ordinance after determining that the city council's pre-enactment findings were adequate); Tollis Inc. v. San Bernardino County, 827 F.2d 1329, 1333 (9th Cir. 1987) ("The County must show that in enacting the particular limitations . . . it relied upon evidence permitting the reasonable inference that, absent such limitations, the adult theaters would have harmful secondary effects"); International Eateries of America, Inc. v. Broward County, 941 F.2d 1157, 1163 (11th Cir. 1991) (noting that Broward County had relied on the experiences of Detroit in enacting its ordinance), cert. denied, 503 U.S. 920 (1992).

suspect, Christy v. Ann Arbor, 824 F.2d. 489 (6th Cir. 1987). cert. denied, 484 U.S. 1059 (1988), did not have legislative records.

The majority also looks for support to the decision by this court in Contractors Ass'n v. City of Phila., 6 F.3d 990 (3d Cir. 1993). Aside from the fact that Contractors is inapposite in that it was an affirmative action case, principally sought injunctive relief, and did not involve free speech, it does not stand for the proposition that pre-enactment evidence is unnecessary. We simply stated in Contractors that the pre-enactment evidence considered by the Philadelphia City Council could be supplemented by post-enactment evidence at the time the case went to trial. Id. at 1003-04. Moreover, we were uncertain whether the supplemental evidence did not in fact constitute pre-enactment evidence because it was a study involving minimal risk of "insincerity associated with post-enactment evidence" for it consisted "essentially of an evaluation and re-ordering of pre-enactment evidence. . . ." Finally, the court was strongly influenced in permitting the admission of the post-enactment study because "the principal relief sought, and the only relief granted by the district court, was an injunction." Id. at 1004.

At this juncture, the effects of adult entertainment establishments are so open and notorious that requiring legislative bodies to consult studies or other evidence confirming their deleterious impact may seem unnecessarily burdensome -- just another hoop to jump through in the process of lawmaking. However, this requirement is not without purpose. It

limits the risk that legislatures will impose restrictions on speech activities on the basis of supposed secondary effects that on closer scrutiny lack any evidentiary support, and it lends support to the representation that the content-neutral interest articulated by the lawmaking body was not merely pretextual and illicitly designed to suppress speech expression, even that constitutionally protected.[12]  I am as sympathetic as the majority to Keyport's well-intentioned purpose of preserving its community life, but the First Amendment cases show that "in those instances where protected speech grates most unpleasantly against the sensibilities that judicial vigilance must be at its height." Young v. American Mini Theatres, 427 U.S. at 87 (Stewart, J., dissenting).  Because the Borough of Keyport had no evidence of deleterious secondary effects before it when it enacted its restrictive zoning ordinance, our jurisprudence requires that we strike down the ordinance as unconstitutional.

## II.

Accordingly, I believe that we must reverse the district court's grant of the defendants' motion to dismiss on

---

12. The majority suggests that this modest procedural hurdle will be of little practical effect against a "municipal body bent on regulating or curbing speech." Maj. op. at 31.  I agree that a legislature determined to restrict forms of speech to which it is hostile may be able to conceal its impermissible motive behind a quickly assembled evidentiary fig leaf.  At the same time, I would reasonably expect that the pre-enactment justification requirement might act as a shield for the First Amendment not merely from those with ill intent, who may be able to circumvent any procedural requirements imposed, but also from constitutionally-minded legislators driven by haste or misconception.

the due process claims and reverse the district court's denial of plaintiffs' motion for summary judgment on the First Amendment challenge to the "adult entertainment uses" ordinance No. 31-92. For the reasons stated above, I would hold that the ordinance does violate the First Amendment, strike it down, and remand the case to the district court to consider plaintiffs' request for damages. Finally, I would vacate the denial of attorney's fees and also remand this issue to the district court for further proceedings.