OPINION OF THE COURT
SLOVITER, Circuit Judge.
At issue is whether the First Amendment precludes imposition of civil damages for the disclosure of portions of a tape recording of an intercepted telephone conversation containing information of public significance when the defendants, two radio stations, their reporter, and the individual who furnished the tape recording, played no direct or indirect role in the interception.
I.
BACKGROUND
A.
From the beginning of 1992 until the beginning of 1994, Wyoming Valley West *113 School District was in contract negotiations with the Wyoming Valley West School District Teachers’ Union (the “Teachers’ Union”) over the terms of the teachers’ new contract. The negotiations, which were markedly contentious, generated significant public interest and were frequently covered by the news media.
Plaintiffs Gloria Bartnieki and Anthony F. Kane, Jr., as well as defendant Jack Yocum, all were heavily involved in the negotiating process. Bartnieki was the chief negotiator on behalf of the Teachers’ Union. Kane, a teacher at Wyoming Valley West High School, served as president of the local union. Yocum served as president of the Wyoming Valley West Taxpayers’ Association, an organization formed by local citizens for the sole purpose of opposing the Teachers’ Union’s proposals.
In May of 1993, Bartnieki, using her cellular phone, had a conversation with Kane. They discussed whether the teachers would obtain a three-percent raise, as suggested by the Wyoming Valley West School Board, or a six-percent raise, as suggested by the Teachers’ Union. In the course of their phone conversation, Kane stated:
If they’re not going to move for three percent, we’re gonna have to go to their, their homes ... to blow off then[1] front porches, we’ll have to do some work on some of those guys.... Really, uh, really and truthfully, because this is, you know, this is bad news (undecipherable) The part that bothers me, they could still have kept to their three percent, but they’re again negotiating in the paper. This newspaper report knew it was three percent. What they should have said,’we’ll meet and discuss this.’ You don’t discuss the items in public.
App. at 35-36. Bartnieki responded, “No,” and, Kane continued, “You don’t discuss this in public.... Particularly with the press.” App. at 36.
This conversation, including the statements quoted above, was intercepted and recorded by an unknown person, and the tape left in Yocum’s mailbox. Yocum retrieved the tape, listened to it, and recognized the voices of Bartnieki and Kane. He then gave a copy of the tape to Fred Williams, also known as Frederick W. Vopper, of WILK Radio and Rob Neyhard of WARM Radio, both local radio stations. Williams repeatedly played part of the tape on the air as part of the Fred Williams Show, a radio news/public affairs talk show which is broadcast simultaneously over WILK Radio and WGBI-AM. The tape was also aired on some local television stations and written transcripts were published in some newspapers.
B.
Bartnieki and Kane sued Yocum, Williams, WILK Radio, and WGBI Radio (hereafter “media defendants”) under both federal and state law. They based their federal claims on Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended by the Electronic Communications Privacy Act of 1986, 28 U.S.C. § 2510 et seq., and their state claims on the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons.Stat. § 5701 et seq. As relief, Bartnicki and Kane sought (1) actual damages in excess of $50,000, (2) statutory damages under 18 U.S.C. § 2520(c)(2), (3) liquidated damages under 18 Pa. Cons.Stat. § 5725(a)(1), (4) punitive damages, and (5) attorneys’ fees and costs.
Bartnieki, Kane, and the defendants each moved for summary judgment. The District Court denied these motions on June 14, 1996 and denied defendants’ motion to reconsider on November 8, 1996, specifically holding that imposing liability on the defendants would not violate the First Amendment.
The District Court subsequently certified two questions as controlling questions of law: “(1) whether the imposition of liability on the media Defendants under the [wiretapping statutes] solely for broadcasting the newsworthy tape on the Defendant *114 Fred Williams’ radio news/public affairs program, when the tape was illegally intercepted and recorded by unknown persons who were not agents of the Defendants, violates the First Amendment; and (2) whether imposition of liability under the aforesaid [wiretapping statutes] on Defendant Jack Yocum solely for providing the anonymously intercepted and recorded tape to the media Defendants violates the First Amendment.” App. at 388. Williams, WILK Radio, and WGBI Radio subsequently petitioned for permission to appeal. Yocum filed an answer to the petition in which he joined the media defendants’ request that we hear this appeal. We granted the petition by order dated February 26, 1998. The Pennsylvania State Education Association submitted a brief as amicus curiae in support of the appellees, and the United States has intervened as of right pursuant to 28 U.S.C. § 2403.
C.
The District Court had jurisdiction to consider claims based on the Omnibus Crime Control and Safe Streets Act of 1968 pursuant to 28 U.S.C. § 1331. It had supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to consider claims based on the Pennsylvania Wiretapping and Electronic Surveillance Control Act. We have appellate jurisdiction to review the District Court’s substantive determination pursuant to 28 U.S.C. § 1292(b).
The scope of our review in a permitted interlocutory appeal is limited to questions of law raised by the underlying order. We are not limited to answering the questions certified, however, and may address any issue necessary to decide the appeal. See Dailey v. National Hockey League, 987 F.2d 172, 175 (3d Cir.1993).
We review the grant or denial of a motion for summary judgment de novo. See H.K. Porter Co. v. Pennsylvania Ins. Guaranty Ass’n, 75 F.3d 137, 140 (3d Cir. 1996). We are “required to apply the same test the district court should have utilized initially,” to view inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion, and to take the non-movant’s allegations as true whenever these allegations conflict with those of the movant. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976).
D.
The Federal Omnibus Crime Control and Safe Streets Act of 1968 (the “Federal Wiretapping Act”) provides in relevant part:
(1) Except as otherwise specifically provided in this chapter any person who—
(c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;
(d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection ...
shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).
18 U.S.C. § 2511. It continues:
(a) In general. — Except as provided in section 2511(2)(a)(ii), any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity which engaged in the violation such relief as may be appropriate.
*115 18 U.S.C. § 2520. The Federal Wiretapping Act thus creates civil and criminal causes of action against those who intentionally use or disclose to another the contents of a wire, oral, or electronic communication, knowing or having reason to know that the information was obtained in violation of the statute.
The Pennsylvania Wiretapping and Electronic Surveillance Control Act (the “Pennsylvania Wiretapping Act”) is similar. It provides:
Except as otherwise provided in this chapter, a person is guilty of a felony of the third degree if he:
(2) intentionally discloses or endeavors to disclose to any other person the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication; or
(3) intentionally uses or endeavors to use the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication.
18 Pa. Cons.Stat. § 5703. It further provides:
(a) Cause of action. — Any person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of this chapter shall have a civil cause of action against any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication....
18 Pa. Cons.Stat. § 5725. The Pennsylvania Wiretapping Act thus also creates civil and criminal causes of action based on the knowing or negligent use or disclosure of illegally intercepted material. We refer to the federal and state statutes at issue here as “The Wiretapping Acts.”
Both Acts also explicitly authorize the recovery of civil relief. The Federal Wiretapping Act provides that a court may assess as damages whichever is the greater of—
(A) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or
(B) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000.
18 U.S.C. § 2520(c)(2). The Pennsylvania Wiretapping Act specifies that a successful plaintiff shall be entitled to recover from any such person:
(1) Actual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of violation, or $1,000, whichever is higher.
(2) Punitive damages.
(3) A reasonable attorney’s fee and other litigation costs reasonably incurred.
18 Pa. Cons.Stat. § 5725(a).
II.
DISCUSSION
A.
As the District Court acknowledged and the parties do not dispute, the media defendants neither intercepted nor taped the conversation between Bartnicki and Kane. Indeed, the record does not disclose how or by whom the conversation was intercepted. The media defendants argued before the District Court that these facts preclude a court from finding them hable under the Wiretapping Acts. The District Court disagreed. It concluded that, “a violation of these acts can occur by the mere finding that a defendant had a reason to believe that the communication that he disclosed or used was obtained through the use of an illegal interception.” Bartnicki v. Vopper, No. 94-1201, slip op. at 5 (M.D. Pa. June 17, 1996). It further opined that such an interpretation of the statute “adheres to the purpose of the act *116 which was to protect wire and oral communications and an individual’s privacy interest in such.” Id. The District Court concluded that genuine disputes of material fact remain regarding (1) whether the Bartnieki-Kane conversation was illegally intercepted, and if so (2) whether any or all of the defendants knew or had reason to know that that conversation was illegally intercepted. See id. at 5, 10. The parties do not challenge these holdings on appeal.
Hence, this case does not involve the prohibitions of the Wiretapping Acts against the actual interception of wire communications. Nor does it involve any application of the Acts’ criminal provisions. Rather, this case focuses exclusively on the portions of the Wiretapping Acts that create causes of action for civil damages against those who use or disclose intercepted communications and who had reason to know that the information was received through an illegal interception.
The defendants argue that applying the damages provision of the Wiretapping Acts to hold them liable for disclosing the Bartnicki-Kane conversation violates the First Amendment. They contend that this case is controlled by the Supreme Court’s decisions in a series of cases addressing the tension between the First Amendment and the right to privacy.
In the first of these cases, Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), the Court considered a private right of action created by a Georgia statute making it a “misdemeanor to publish or broadcast the name or identity of a rape victim.” Id. at 472, 95 S.Ct. 1029. The Court was asked to decide whether Georgia could impose civil liability on a television broadcasting company, among others, for accurately broadcasting the name of a deceased, 17-year-old rape victim where the reporter obtained the information from official court records open to public inspection.
In the next case, Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978), the Court reviewed a Virginia statute that both provided for the confidentiality of judicial disciplinary proceedings and made it unlawful to divulge the identity of a judge subject to such proceedings prior to the filing of a formal complaint with the state’s highest court. The Supreme Court was asked to decide whether Virginia could criminally prosecute a newspaper for publishing accurate information about such proceedings where the newspaper received the information from a participant in the proceedings who had the right to receive the information but not the right to divulge it. See id. at 830, 98 S.Ct. 1535.
Finally, in Smith v. Daily Mail Publishing Co., 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979), the Court considered a West Virginia statute “making it a crime for a newspaper to publish, without the written approval of the juvenile court, the name of any youth charged as a juvenile offender.” Id. at 98, 99 S.Ct. 2667. The Court was asked to decide whether West Virginia could prosecute two newspapers for publishing the name of a 14-year-old student who was accused of shooting and killing a 15-year-old classmate at the local junior high school. The newspapers had obtained the student’s name by interviewing witnesses at the school.
The Supreme Court concluded that each of these attempts to punish or deter the press’s publication of truthful information was unconstitutional. The Smith Court, in summarizing the Court’s past cases, read them as suggesting at least two propositions: (1) “state action to punish the publication of truthful information seldom can satisfy constitutional standards,” and (2) “if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order.” 491 U.S. at 102, 103, 109 S.Ct. 2324; accord Florida Star v. B.J.F., 491 U.S. 524, 533-37, 109 *117 S.Ct. 2603, 105 L.Ed.2d 443 (1989) (adopting and explaining the justification for the second Smith proposition).
The defendants contend that the information disclosed about the Bartnicki-Kane conversation was lawfully obtained within the meaning of the Smith decision because the defendants in this case neither participated in the presumed interception nor violated any law by receiving the information. They conclude that the Wiretapping Acts may not be applied to hold them liable without first meeting the test of strict scrutiny.
Bartnicki and Kane respond by arguing that the information at issue here was unlawfully obtained because the original interception presumably was illegal. They conclude that applying the Acts to hold the defendants liable is constitutional without subjecting those statutes to any level of First Amendment scrutiny. The parties thus assume that we should determine the constitutionality of the Wiretapping Acts by first determining whether the information disclosed was “lawfully” or “unlawfully” obtained.
Although we are cognizant of the importance of the Cox, Landmark, and Smith cases as background, we decline to read Smith as controlling here. The Supreme Court has explicitly repudiated any suggestion that Smith answers the question whether a statute that limits the dissemination of information obtained by means of questionable legality is subject to First Amendment scrutiny. In Florida Star, the Court stated, “The [Smith] principle does not settle the issue whether, in cases where information has been acquired unlawfully by a newspaper or by a source, government may ever punish not only the unlawful acquisition, but the ensuing publication as well.” 491 U.S. at 535 n. 8, 109 S.Ct. 2603. Similarly, the Smith Court was careful to note that its holding did not reach the issue of unlawful press access. See 443 U.S. at 105, 99 S.Ct. 2667.
Moreover, the Supreme Court’s practice of narrowly circumscribing its holdings in this area strongly suggests that a rule for undecided cases should not be derived by negative implication from its reported decisions. The defendant in Landmark urged the Court to adopt a blanket rule, protecting the press from any liability for truthfully reporting information concerning public officials and their public duties, but the Supreme Court refused to do so. See 435 U.S. at 838, 98 S.Ct. 1535. Instead it considered the very narrow question: “whether [a state] may subject persons, including newspapers, to criminal sanctions for divulging information regarding proceedings before a state judicial commission which is authorized to hear complaints as to judges’ disability or misconduct, when such proceedings are declared confidential by the State Constitution and statutes.” Id. at 830, 98 S.Ct. 1535.
Similarly, the Florida Star Court refused “appellant’s invitation to hold broadly that truthful publication may never be punished consistent with the First Amendment.” 491 U.S. at 532,109 S.Ct. 2603. It stated: “Our cases have carefully eschewed reaching this ultimate question, mindful that the future may bring scenarios which prudence counsels our not resolving anticipatorily.... We continue to believe that the sensitivity and significance of the interests presented in clashes between First Amendment and privacy rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case.” Id. at 532-33,109 S.Ct. 2603.
In keeping with the Supreme Court’s approach to deciding these illustrative cases, we will resolve the present controversy not by mechanically applying a test gleaned from Cox and its progeny, but by reviewing First Amendment principles in light of the unique facts and circumstances of this case.
*118 B.
The District Court based its conclusion that the damages provision of the Wiretapping Acts may constitutionally be applied to penalize the defendants’ conduct primarily on the Supreme Court’s decision in Cohen v. Cowles Media Co., 501 U.S. 663, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991). The District Court interpreted that decision as standing for the proposition that a generally applicable law that neither singles out the press for special burdens nor purposefully restricts free expression does not offend the First Amendment. See Bartniclci, slip op. at 8 (“Generally applicable laws ‘do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news.’ ” (quoting Cohen v. Cowles Media Co., 501 U.S. 663, 669, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991))). The District Court emphasized language from the Cohen opinion in which the Supreme Court stated, “ ‘[i]t is ... beyond dispute that the publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others.’ ” Bartnicki, slip op. at 8 (quoting Cohen, 501 U.S. at 670, 111 S.Ct. 2513).
After reviewing the Federal and Pennsylvania Wiretapping Acts, the District Court found that neither Act targets or singles out the press. The District Court also opined that these laws are not “specifically designed to chill free speech.” Id. at 7. Based on this finding, it concluded that “both acts are matters of general applicability” and, without further analysis, denied defendants’ motion for summary judgment on the basis of the First Amendment.
There is reason to question whether the damages provisions of the Acts are properly categorized as generally applicable laws. Arguably, that term should be reserved for laws that directly regulate conduct rather than speech. See infra at 119. Moreover, it may well be that be that by banning the disclosure of certain information, the damages provisions impose a disproportionate burden on the press. Indeed, we would not be surprised to find that a prohibition on disclosure falls more heavily on the press, which is in the business of disseminating information, than it does on ordinary citizens whose opportunities for spreading information are more limited.
We need not resolvé that question, however, because we conclude that, by suggesting that generally applicable laws do not require First Amendment scrutiny when applied to the press, the District Court read the cited portions of Cohen too broadly. In Cohen, the plaintiff, who was actively associated with the election staff of a gubernatorial candidate, .offered to provide two newspapers with some information concerning the candidate’s opponent in exchange for a promise that the newspapers would not use his name in any resulting story. After having made the promise and secured the information, each newspaper proceeded to publish a story identifying Cohen as the source of the information and highlighting his role in the gubernatorial campaign. Cohen lost his job the day the stories ran. He then sued the publishers of the newspapers in state court and recovered damages under a theory of promissory estoppel. The publishers appealed, arguing that holding them liable for their breached promises would violate the First Amendment.
It is in the context of rejecting this argument that the Supreme Court stated, “[Gjenerally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news.” Cohen, 501 U.S. at 669, 111 S.Ct. 2513. The Court explained that “enforcement of such general laws against the press is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations.” Id. at 670, 111 S.Ct. 2513.
*119 The Cohen opinion thus instructs that a law of general applicability, which neither targets nor imposes disproportionate burdens upon the press, is enforceable against the press to the same extent that it is enforceable against individuals or organizations. The question remains whether the damages provisions of the Wiretapping Acts may constitutionally be applied to penalize individuals or organizations for disclosing material they know or have reason to know was illegally intercepted who had no part in the interception.
C.
In order to determine whether the provisions for civil sanctions from the Wiretapping Acts may constitutionally be applied to penalize defendants’ disclosure, we must first decide what degree of First Amendment scrutiny should be applied.
The United States argues that the Federal Wiretapping Act is subject to intermediate rather than strict scrutiny. It bases this contention on two subsidiary assertions: (1) that these are “general law[s] that impose[ ] only incidental burdens on expression” and (2) that “to the extent that Title III restricts speech in particular cases, it does so in an entirely content-neutral fashion.” United States’ Br. at 22. It states that “[a] statute satisfies intermediate scrutiny, if it furthers an important or substantial governmental interest, if the governmental interest is unrelated to the suppression of free expression, and if the incidental restriction on speech is not unnecessarily great.” United States’ Br. at 11-12. We assume that the United States’ arguments apply equally to the Pennsylvania Wiretapping Act, which is substantially similar to the Federal Wiretapping Act.
We first consider the United States’ argument that the disclosure provisions of the Wiretapping Acts merit only intermediate scrutiny because they impose only incidental burdens on expression. In support, the United States cites a series of Supreme Court decisions, beginning with United States v. O’Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).
O’Brien was arrested and convicted for burning his draft card on the steps of the South Boston Courthouse. On appeal, O’Brien argued that the federal law, making it an offense to “forge[ ], alter[ ], knowingly destroy[ ], knowingly mutilate[ ], or in any manner change[ ] ... such [a] certificate,” was unconstitutional. Id. at 370, 88 S.Ct. 1673 (italics omitted). The Court of Appeals for the First Circuit agreed that this provision unconstitutionally abridged the freedom of speech.
The Supreme Court, however, reversed. It opined that the statute “on its face deals with conduct having no connection with speech. It prohibits the knowing destruction of certificates issued by the Selective Service System, and there is nothing necessarily expressive about such conduct.” Id. at 375, 88 S.Ct. 1673.[1] The Supreme Court nonetheless recognized that O’Brien had burned his draft card as a form of protest against war. Assuming for the sake of argument that “the alleged communicative element in O’Brien’s conduct [was] sufficient to bring into play the First Amendment,” the Supreme Court held that the statute was still a permissible regulation. Id. at 376, 88 S.Ct. 1673. It reasoned that “when ‘speech’ and ‘non-speech’ elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.” Id. The Court stated that such “a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater *120 than essential to the furtherance of that interest.” Id. at 377, 88 S.Ct. 1673.
In O’Brien and its progeny, the Supreme Court distinguished between “expressive conduct protected to some extent by the First Amendment” and oral or written expression, which is fully protected by that amendment. Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). “[C]onduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative” is “[sjymbolic expression,” otherwise known as expressive conduct. Id. at 294, 104 S.Ct. 3065. The cases the United States cites in addition to O’Brien also focus on the permissibility of regulating expressive conduct. See Barnes v. Glen Theatre, Inc., 501 U.S. 560, 111 S.Ct. 2456,115 L.Ed.2d 504 (1991) (Indiana statute prohibiting complete nudity in public places); Arcara v. Cloud Books, Inc., 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986) (New York statute authorizing closure of building found to be a public health nuisance); United States v. Albertini, 472 U.S. 675, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985) (federal statute making it unlawful to reenter a military base after having been barred by the commanding officer); Clark, 468 U.S. at 289, 104 S.Ct. 3065 (National Park Service regulation prohibiting camping in Lafayette Park); cf. R.A.V. v. City of St. Paul, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (Minnesota statute prohibiting display of certain objects, including a burning cross or Nazi swastika).
By citing this line of cases in support of its position that intermediate scrutiny applies here, the United States apparently suggests that defendants’ actions in disclosing the contents of the Bartnicki-Kane conversation are properly considered “expressive conduct” rather than speech. If this is the thrust of the government’s citations, it is not persuasive. The acts on which Bartnicki and Kane base their complaint are Yocum’s “intentionally disclosing a] tape to several individuals and media sources”[2] and the media defendants’ “intentionally disclosing] and publishing] to the public the entire contents of the private telephone conversation between Bartnicki and Kane.” App. at 149. If the acts of “disclosing” and “publishing” information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct.
We have no doubt that it is possible to identify some act by the media defendants in the course of preparing the broadcasts during which the tape was disclosed that falls within our ordinary understanding of the term conduct. However, this fact does not alter the analysis. The Supreme Court has observed, “It is possible to find some kernel of expression in almost every activity a person undertakes — for example, walking down the street or meeting one’s friends at a shopping mall — but such kernel is not sufficient to bring the activity within the protection of the First Amendment.” Barnes, 501 U.S. at 570, 111 S.Ct. 2456 (quoting Dallas v. Stanglin, 490 U.S. 19, 25, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989)). Similarly, although it may be possible to find some kernel of conduct in almost every act of expression, such kernel of conduct does not take the defendants’ speech activities outside the protection of the First Amendment.
The United States nonetheless insists that intermediate scrutiny is appropriate because the statute, read as a whole, primarily prohibits conduct rather than speech. It notes that the prohibition in 18 U.S.C. § 2511(l)(d) against using or endeavoring to use intercepted material encompasses more than disclosure. The government asserts that it precludes, for *121 example, a person or company from using intercepted material to develop a competing product, to craft a negotiating strategy, or to justify taking disciplinary action against an employee. United States’ Br. at 22-23.
The government cites no support for the surprising proposition that a statute that governs both pure speech and conduct merits less First Amendment scrutiny than one that regulates speech alone. We are convinced that this proposition does not accurately state First Amendment law. A statute that prohibited the “use” of evolution theory would surely violate the First Amendment if applied to prohibit the disclosure of Charles Darwin’s writings, much as a law that directly prohibited the publication of those writings would surely violate that Amendment.
Because the defendants’ acts in this case — the disclosure and broadcast of information — contain no significant “non-speech” elements, we need not decide whether this statute could properly be subjected to lesser scrutiny if applied to prohibit “uses” that do involve such “non-speech” elements. We merely hold that, when a statute that regulates both speech and conduct is applied to an act of pure speech, that statute must meet the same degree of First Amendment scrutiny as a statute that regulates speech alone.
The United States’ second argument— that intermediate scrutiny applies because the Acts are content-neutral — is more persuasive.
When the state uses a “content-based” regulation to restrict free expression, particularly political speech, that regulation is subject to “the most exacting scrutiny.” Boos v. Barry, 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988); Phillips v. Borough of Keyport, 107 F.3d 164, 172 (3d Cir.1997) (en banc). It will not be upheld unless the state can show that it “is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.” Boos, 485 U.S. at 321, 108 S.Ct. 1157; see also Phillips, 107 F.3d at 172 (“State regulations of speech that are not regarded as content neutral will be sustained only if they are shown to serve a compelling state interest in a manner which involves the least possible burden on expression.”).
By contrast, when the state places a reasonable “content-neutral” restriction on speech, such as a time, place and manner regulation, that regulation need not meet the same high degree of scrutiny. “Content-neutral” restrictions are valid under the First Amendment provided that they “are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of information.”[3] Clark, 468 U.S. at 293,104 S.Ct. 3065.
We recognize that an argument could be made that the Wiretapping Acts are content-based. Ordinarily, the distinction between permissible and impermissible regulation of speech depends on whether the law at issue regulates the substantive content of the speech (what is said) or whether it merely regulates the time, place, or manner of the speech (when, where, at what volume, and through which medium it is said). The former regulations are content-based while the latter are content-neutral. The essence of the distinction lies in the fact that, if the regulation were content-based, it would not be possible to determine whether a particular speech is prohibited without referring to the substantive import of that expression.
The United States contends that the Wiretapping Acts are not content-based even in the literal sense referred *122 to above because the Acts define the content that is prohibited by reference to the manner in which the information was acquired, rather than to its subject matter or viewpoint. We suspect that the mere fact that a regulation defines the category of content that is prohibited by reference to its source rather than its subject matter is unlikely to be sufficient to justify treating the regulation as content-neutral. For example, one might argue that a ban on the publication of information obtained through experimentation on human embryos would raise sufficient First Amendment concerns to merit heightened scrutiny, even if such experimentation were illegal.
The Supreme Court’s decision in Renton v. Playtime Theatres, Inc., 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), however, suggests that we are not limited to a literal interpretation of the phrase “content-neutral” but may determine whether speech is content-neutral or content-based with reference to the government’s proffered justification for the restriction. In Renton, the Supreme Court described “content-neutral” speech restrictions as those that “are justified without reference to the content of the regulated speech.” Id. at 48, 106 S.Ct. 925 (quoting Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)). We therefore turn to consider the purpose or purposes the Wiretapping Acts are meant to serve.
The Senate Report describes the purposes of the Federal Wiretapping Act as: “(1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized.” S.Rep. No. 90-1097 (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2153. Congress thus focused on privacy in adopting 18 U.S.C. § 2511, the provision that prohibits the interception of wire, oral, or electronic communications, as well as the use or disclosure of the contents of illegally intercepted communications. Congress did not, however, define the privacy interest that it intended the Act to protect.
As commonly understood, the right to privacy encompasses both the right “to be free from unreasonable intrusions upon [one’s] seclusion” and the right to be free from “unreasonable publicity concerning [one’s] private life.” Fultz v. Gilliam, 942 F.2d 396, 401 (6th Cir.1991); see also Whalen v. Roe, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977); Paul P. v. Verniero, 170 F.3d 396 (3d Cir.1999). The Sixth Circuit has opined that “[t]he prohibitions Congress incorporated into section 2511(1) of Title III protect both these interests first, by prohibiting the surreptitious interception of private communications in the first instance — a highly offensive physical intrusion on the victim’s private affairs — and second, by circumscribing the dissemination of private information so obtained.” Fultz, 942 F.2d at 401 (footnote omitted). The First Circuit has similarly suggested that by enacting Title III Congress recognized “that the invasion of privacy is not over when the interception occurs but is compounded by disclosure.” Providence Journal Co. v. FBI, 602 F.2d 1010, 1013 (1st Cir.1979); see also Fultz, 942 F.2d at 402 (“Each time the illicitly obtained recording is replayed to a new and different listener, the scope of the invasion widens and the aggrieved party’s injury is aggravated.”).
We have no doubt that the state has a significant interest in protecting the latter privacy right — the right not to have intimate facts concerning one’s life disclosed without one’s consent. That right is a venerable one whose constitutional significance we have recognized in the past. See Paul P., 170 F.3d at 401-02 (collecting cases). We also have no doubt that the prohibition on using or disclosing the contents of an illegally intercepted communication serves that interest by deterring the publicization of private facts.
*123 We are less certain, however, that the desire to protect the privacy interest that inheres in private facts is a content-neutral justification for restricting speech. The Supreme Court has instructed that “[l]isteners’ reaction to speech is not a content-neutral basis for regulation.” Forsyth County v. Nationalist Movement, 505 U.S. 123, 134, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992); accord Lind v. Grimmer, 30 F.3d 1115, 1117 (9th Cir.1994) (“Because the[ ] concerns [addressed by the statute] all stem from the direct communicative impact of speech, we conclude that section ll-216(d) regulates speech on the basis of its content.”) As Justice O’Connor explained in Boos, “[regulations that focus on the direct impact of speech on its audience” — the speech’s “primary effects”— are not properly treated as content-neutral under Renton. 485 U.S. at 321, 108 S.Ct. 1157 (Opinion of O’Connor, J.).
Although the defendants do not argue that the regulations at issue are content-based, there is a not implausible argument that the injury associated with the disclosure of private facts stems from the communicative impact of speech that contains those facts, i.e. having others learn information about which one wishes they had remained ignorant. Thus, under the Supreme Court’s jurisprudence, the injury associated with such disclosure constitutes a “primary effect” of the disfavored speech, rather than a “secondary effect.” This reasoning might suggest that a statute that regulated expression for the purpose of protecting the right not to have private facts disclosed without permission would be subject to strict scrutiny as a content-based regulation.
We do not decide whether the Wiretapping Acts would indeed be properly categorized as content-based if justified on the basis of a need to prevent the disclosure of private facts because the United States for the most part eschews reliance on that justification in explaining the purpose of those acts. Instead, the United States argues that “the fundamental purpose of Title III is to maintain the confidentiality of wire, electronic, and oral communications.” United States’ Br. at 33. It reasons that “prohibiting the use of illegally intercepted communication ... ‘strengthen^] subsection (l)(a),’ the provision that imposes the underlying ban on unauthorized interception, ‘by denying the wrongdoer the fruits of his labor’ and by eliminating the demand for those fruits by third parties.” United States’ Br. at 33. We are satisfied that this latter justification does not rely on the communicative impact of speech and, therefore, that the Acts are properly treated as content-neutral.
D.
Accordingly, we adopt the government’s position that we should apply intermediate scrutiny in our analysis of the issue before us. In doing so, we must first fix upon an acceptable definition of the term “intermediate scrutiny.”[4] Intermediate scrutiny is used by the Court in a wide variety of cases calling for some balancing. Thus, intermediate scrutiny has been applied to statutes that discriminate on the basis of gender. See Craig v. Boren, 429 U.S. 190, 200, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (holding that prohibiting sale of 3.2% beer to males under 21 and females under 18 did not “closely serve” goal of promoting traffic safety). It is the review standard used to examine whether an even-handed regulation promulgated for a legitimate public interest violates the dormant Commerce Clause. See Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) (describing balancing test for state regulation); Southern Pac. Co. v. Arizona ex rel Sullivan, 325 U.S. *124 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945) (invalidating limit on train length as not “plainly essential” to further state interest in safety). And in the First Amendment context, intermediate scrutiny has been applied to commercial speech cases, see Central Hudson Gas & Elec. Corp. v. Public Sen. Comrn’n., 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (establishing four-part test for commercial speech regulation), and to examine the validity of time, place, and manner regulations, see United States v. Grace, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (invalidating statute prohibiting displaying flag, banner or device in Supreme Court building or on its grounds).
Admittedly, the intermediate scrutiny test applied varies to some extent from context to context, and case to case. But it always encompasses some balancing of the state interest and the means used to effectuate that interest. And despite the frequent tendency to assume that regulations that are reviewed under less exacting scrutiny than strict scrutiny will be upheld, each of the cases referred to above as applying intermediate scrutiny held that the regulation in question was unconstitutional. The reasons varied. Sometimes, the Court held the asserted government interest insufficient to justify an expansive prohibition and noted the government failed to demonstrate that a lesser prohibition would not adequately serve its purpose. See, e.g., Schneider v. State, 308 U.S. 147, 162, 60 S.Ct. 146, 84 L.Ed. 155 (1939) (holding that state interest in preventing littering did not justify ban on leafletting); Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 636, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) (invalidating prohibition on charitable solicitations for certain charities as too destructive of First Amendment interests). Other times, the Court held the government failed to show that the challenged regulation substantially served the asserted government interest. See, e.g., Grace, 461 U.S. at 182, 103 S.Ct. 1702. It should also be noted that in making the examination into whether the means chosen were those appropriate to the government interest, the Court has not always made a distinction between its analysis for purposes of intermediate scrutiny and for strict scrutiny. See, e.g., Anderson v. Celebrezze, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (invalidating candidate registration statute because voters’ associational and voting rights outweighed state interest).
The test usually applied in First Amendment cases to content-neutral regulation requires an examination of whether the regulation is “narrowly tailored to serve a significant governmental interest” and “leave[s] open ample alternative channels for communication.” Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). There is a considerable number of First Amendment cases in which the Supreme Court, applying intermediate scrutiny, has found that the regulation at issue, albeit designed to advance legitimate state interests, failed to withstand that scrutiny. A review of illustrative cases provides some indication of the Court’s analytic approach in such instances.
In Schneider, the Court recognized that there is a legitimate government interest in preventing street littering but nevertheless found that “the purpose to keep the streets clean and of good appearance is insufficient to justify an ordinance which prohibits a person rightfully on a public street from handing literature to one willing to receive it.” 308 U.S. at 162, 60 S.Ct. 146. The Court termed the burden imposed on the cities in cleaning and caring for the streets “an indirect consequence of such distribution,” and one that resulted from the “constitutional protection of the freedom of speech and press.” Id. The Court continued, in language significant for this case, “[tjhere are obvious methods of preventing littering. Amongst these is the punishment of those who actually *125 throw papers on the streets.” Id. (emphasis added).
Similarly, in Village of Schaumburg, the Court recognized that the government had a substantial interest in protecting the public from fraud, crime and undue annoyance, but held that the proffered interest, which the government sought to accomplish by an ordinance that prohibited the solicitation of contributions by charitable organizations that did not use at least 75% of their receipts for “charitable purposes,” was “only peripherally promoted by the 75-percent requirement and could be sufficiently served by measures less destructive of First Amendment interests.” 444 U.S. at 636, 100 S.Ct. 826.
Both Schneider and Schaumburg were cited by the Court in a later case to illustrate “the delicate and difficult task [that] falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of [First Amendment] rights.” Schad v. Borough of Mount Ephraim, 452 U.S. 61, 70, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (quoting Schneider, 308 U.S. at 161, 60 S.Ct. 146). In Schad, the Court invalidated a zoning ordinance that excluded live entertainment, including nude dancing, throughout the borough after finding that the borough “ha[d] not adequately justified its substantial restriction of protected activity.” Id. at 72, 101 S.Ct. 2176. Justice Blackmun’s concurring opinion makes clear that the burden to “articulate, and support, a reasoned and significant basis” for the governmental regulation should not be viewed as de minimis, even when the regulation is subjected to intermediate scrutiny. Id. at 77, 101 S.Ct. 2176; see also Geoffrey R. Stone, Content-Neutral Restrictions, 54 U. Chi. L.Rev. 46, 52-53 (1987) (describing intermediate scrutiny as a test that “takes seriously the inquiries into the substantiality of the governmental interest and the availability of less restrictive alternatives.”).
With the Supreme Court precedent as a guide, we examine whether the government has shown that its proffered interest is sufficiently furthered by application to these defendants of the damages provisions of the Wiretapping Acts to justify the impingement on the protected First Amendment interests at stake.
As noted above, the United States contends that the Wiretapping Acts serve the government’s interest in protecting privacy by helping “maintain the confidentiality of wire, electronic, and oral communications.” United States’ Br. at 33. Undoubtedly, this is a significant state interest. We do not understand the defendants to deny that there is an important governmental interest served by the Wiretapping Acts. However, the government recognizes that not all of the provisions of the Wiretapping Acts are being challenged. In fact, only a portion of those Acts are at issue here — the provisions imposing damages and counsel fees for the use and disclosure of intercepted material on those who played no part in the interception.
The United States asserts that these provisions protect the confidentiality of communications in two ways: (1) “by denying the wrongdoer the fruits of his labor” and (2) “by eliminating the demand for those fruits by third parties.” United States’ Br. at 33. In this case, however, there is no question of “denying the wrongdoer the fruits of his labor.” The record is devoid of any allegation that the defendants encouraged or participated in the interception in a way that would justify characterizing them as “wrongdoers.” Thus, the application of these provisions to penalize an individual or radio stations who did participate in the interception and thereafter disclosed the intercepted material is not before us.
We therefore focus on the United States’ second contention — that the provisions promote privacy by eliminating the demand for intercepted materials on the part of third parties. The connection between prohibiting third parties from using or dis *126 closing intercepted material and preventing the initial interception is indirect at best. The United States has offered nothing other than its ipse dixit in support of its suggestion that imposing the substantial statutory damages provided by the Acts on Yocum or the media defendants will have any effect on the unknown party who intercepted the Bartnicki-Kane conversation. Nor has the United States offered any basis for us to conclude that these provisions have deterred any other would-be interceptors.[5] Given the indirectness of the manner in which the United States claims the provisions serve its interest, we are not prepared to accept the United States’ unsupported allegation that the statute is likely to produce the hypothesized effect. See Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 841, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978) (“The Commonwealth has offered little more than assertion and conjecture to support its claim that without criminal sanctions the objectives of the statutory scheme would be seriously undermined.”). Faced with nothing “more than assertion and conjecture,” it would be a long stretch indeed to conclude that the imposition of damages on defendants who were unconnected with the interception even “peripherally promoted” the effort to deter interception. See Village of Schaumburg, 444 U.S. at 636, 100 S.Ct. 826.
When the state seeks to effectuate legitimate state interests,
it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms. Hynes v. Mayor of Oradell, 425 U.S. at 620, 96 S.Ct. 1755; First National Bank of Boston v. Bellotti, 435 U.S. 765, 786, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978).
“Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone .... ” NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (citations omitted).
Village of Schaumburg, 444 U.S. at 637, 100 S.Ct. 826.
In Village of Schaumburg, the Court stated that the Village’s legitimate interest in preventing fraud could be better served by requiring solicitors to inform the public of the uses made of their contributions, than by prohibiting solicitation. Id. Similarly, in Martin v. Struthers, 319 U.S. 141, 147-48, 63 S.Ct. 862, 87 L.Ed. 1313 (1943), the Court held that in lieu of a complete prohibition of door-to-door solicitation, with its draconian impact on First Amendment values, the City could have used the less restrictive means of punishing those who trespass “in defiance of the previously expressed will of the occupant.” Indeed, the Wiretapping Acts already provide for punishment of the offender, i.e., the individual who intercepted the wire communication and who used or disclosed it. See Schneider, 308 U.S. at 162, 60 S.Ct. 146 (city should prevent littering by punishing litterers, not by prohibiting leafleting). Those who indirectly participated in the interception, either by aiding or abetting, would also fall within the sanctions provided by the statute. Therefore, the government’s desired effect can be reached by enforcement of existing provisions against the responsible parties rather than by imposing damages on these defendants.
We are also concerned that the provisions will deter significantly more speech than is necessary to serve the government’s asserted interest. It is likely that in many instances these provisions will *127 deter the media from publishing even material that may lawfully be disclosed under the Wiretapping Acts.
Reporters often will not know the precise origins of information they receive from witnesses and other sources, nor whether the information stems from a lawful source. Moreover, defendants argue that they cannot be held liable for use and publication of information that had previously been disclosed. Assuming this is so, reporters may have difficulty discerning whether material they are considering publishing has previously been disclosed to the public. Such uncertainty could lead a cautious reporter not to disclose information of public concern for fear of violating the Wiretapping Acts.
Bartnicki and Kane recognize that the Supreme Court has frequently expressed concern about the “timidity and self-censorship” that may result from permitting the media to be punished for publishing certain truthful information. See, e.g., Florida Star, 491 U.S. at 535, 109 S.Ct. 2603; Cox Broadcasting, 420 U.S. at 496, 95 S.Ct. 1029. The public interest and newsworthiness of the conversation broadcast and disclosed by the defendants are patent. In the conversation, the president of a union engaged in spirited negotiations with the School Board suggested “blowing] off [the] front porches” of the School Board members. Nothing in the context suggests that this was said in anything other than a serious vein. Certainly, even if no later acts were taken to follow through on the statement, and hence no crime committed, the fact that the president of the school teachers’ union would countenance the suggestion is highly newsworthy and of public significance. Our concerns are only heightened by the Supreme Court’s admonition in Smith that “state action to punish the publication of truthful information seldom can satisfy constitutional standards.” 443 U.S. at 102, 99 S.Ct. 2667.
Our dissenting colleague does not disagree with any of the applicable legal principles. He candidly states that the difference between us is one of “ultimate application of [the agreed upon] analysis to the case at bar.” Dissenting Op. at 130. Therefore, we add only a few brief comments pertaining to that application.
Evidently, one of the principal differences between our respective applications lies in the weight we give the factors to be balanced. The dissent suggests the Supreme Court’s decisions in Schneider, Struthers, and Schaumburg are not pertinent to this case because the state interests in those cases (littered streets, annoying door-to-door proselytizers,[6] and fraudulent charitable solicitors, respectively) were “not very important.” The dissent contrasts those interests with the significant governmental interest at issue here — that of maintaining the confidentiality of wire, electronic, and oral communications.
Presumably, the dissent’s point is that we must weigh more heavily the privacy interests furthered by the Wiretapping Acts than the Court weighed the state interests in the three cited cases. Given the conceded importance of privacy and confidentiality at issue here, we nonetheless find it difficult to accord it more weight.than the interests in preventing disclosure of the name of a rape victim, the identity of a judge in a putative disciplinary proceeding, or the identity of a youth charged as a juvenile offender at issue in Cox Broadcasting, Landmark Communications and Smith, respectively. Yet when faced with each of those circumstances, the Supreme Court determined that despite the strong privacy interest underlying the statutory and state constitutional provisions punishing disclosure of such information, the interests served by the First Amendment must take prece *128 denee.[7] It would be difficult to hold that privacy of telephone conversations are more “important” than the privacy interests the states unsuccessfully championed in those cases.
In addition, we do not share the dissent’s confidence that imposition of civil liability on those who neither participated in nor encouraged the interception is an effective deterrent to such interception. The dissent finds such a nexus in the legislative landscape, where half of the states that prohibit wiretapping also authorize civil damage actions. With due respect, we find this a slim reed, not only because it appears from the dissent’s statistics that the other half of the states with wiretapping statutes have not included a damage provision but because the incidence of state statutes, and hence “widespread legislative consensus,” does not prove the deterrent effect of the prohibition. Indeed, there is not even general agreement as to the deterrent effect of a criminal statute on the perpetrator,[8] much less on those who were not in league with the perpetrator. In determining whether a regulation that restricts First Amendment rights “substantially serves [its asserted] purposes,” see Grace, 461 U.S. at 182, 103 S.Ct. 1702, the Court has never found that question satisfied by sheer numbers of state statutes.
The dissent engages in hyperbole when it suggests that our decision “invalidates a portion of the federal statute” and “by necessary implication spells the demise of a portion of more than twenty other state statutes.” Dissenting Op. at 134. The statutes, which are designed to prohibit and punish wiretapping, remain unimpaired. All that is at issue is the application of those statutes to punish members of the media who neither encouraged nor participated directly or indirectly in the interception, an application rarely attempted.
Moreover, we do not agree that the recent decision in Boehner v. McDermott, 191 F.3d 463 (D.C.Cir.1999), presented that court with the same issue presented here. Most particularly, in Boehner, where a divided court upheld the constitutionality of § 2511(1)(c), all three judges emphasized in their separate opinions that there was no effort to impose civil damages on the newspapers (The New York Times, et al.) which had printed the details of a conversation that been illegally intercepted. Thus, for example, in the lead opinion the court stated at the outset, “[n]or should we be concerned with whether § 2511(1)(c) would be constitutional as applied to the newspapers who published the initial stories about the illegally-intercepted conference call.” Id. at 467. Liability in that case was sought to be imposed on James McDermott, a congressman who caused a copy of the tape to be given to the newspapers. Although technically, defendant Yocum in our case stands in the same position as McDermott, i.e. as the source but not the interceptor, there is an indication in Boehner that McDermott was more than merely an innocent conduit. Indeed, McDermott, unlike Yocum, knew who intercepted the conversation because he “accepted” the tape from the interceptors and, the opinion suggests, not only sought to embarrass his political opponents with the tape but also promised the interceptors immunity for their illegal conduct. Id. at 475-76. In fact, the second judge, who con *129 curred in the judgment and in only a portion of the opinion for the court, specifically limited his concurrence to the decision that § 2511(l)(c) “is not unconstitutional as applied in this case,” id. at 478 (emphasis added), and pointed out that “McDermott knew the transaction was illegal at the time he entered into it,” id. at 479. In contrast, Yocum has not been shown to have “entered into” any transaction with the interceptors. In the posture of this case, all parties accept his allegation that the tape was left in his mailbox.
The Boehner court was acutely aware that no court has yet held that the government may punish the press through imposition of damages merely for publishing information of public significance because its original source acquired that information in violation of a federal or state statute. Cf. Landmark, 435 U.S. at 837, 98 S.Ct. 1535 (finding it unnecessary to adopt categorical approach). As noted earlier in this opinion, the Supreme Court has been asked to permit a state to penalize the publication of truthful information in at least four instances. In three of the four cases, the statutes at issue protected the privacy interests of such vulnerable individuals as juveniles and the victims of sexual assault. See Florida Star, 491 U.S. at 526, 109 S.Ct. 2603; Smith, 443 U.S. at 98, 99 S.Ct. 2667; Cox Broadcasting, 420 U.S. at 472, 95 S.Ct. 1029. In the remaining case, the statute at issue was meant to protect the state’s interest in an independent and ethical judiciary. See Landmark, 435 U.S. at 830, 98 S.Ct. 1535. Despite the strength of the state interests asserted, the Supreme Court in each case concluded that those interests were insufficient to justify the burdens imposed on First Amendment freedoms.
We likewise conclude that the government’s significant interest in protecting privacy is not sufficient to justify the serious burdens the damages provisions of the Wiretapping Acts place on free speech. We are skeptical that the burden these provisions place on speech will serve to advance the government’s goals. Even assuming the provisions might advance these interests, the practical impact on speech is likely to be “substantially broader than necessary.” Ward v. Rock Against Racism, 491 U.S. 781, 800, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).
We therefore hold that the Wiretapping Acts fail the test of intermediate scrutiny and may not constitutionally be applied to penalize the use or disclosure of illegally intercepted information where there is no allegation that the defendants participated in or encouraged that interception. It follows that we need not decide whether these provisions leave open ample alternative channels for communication of information.
III.
CONCLUSION
For the reasons set forth, we will reverse the order of the District Court denying summary judgment to the defendants, and will remand with directions to grant that motion.

. Respected commentators have taken issue with this holding in O'Brien. See, e.g., Lawrence H. Tribe, American Constitutional Law, § 312-6 at 824-25 (2d ed.1988).

. The complaint also alleges that Yocum "obtained a tape of the surreptitiously recorded telephone conversation,” App. at 149, but the complaint does not allege that the mere obtaining of the tape violates either statute.

. This standard is little different from that announced in O'Brien as governing conduct regulations that incidentally restrict expressive behavior. See Clark, 468 U.S. at 298, 104 S.Ct. 3065.

. In a recent article, the author uses the term " ‘intermediate scrutiny’ to refer to a test that requires a state interest which is greater than legitimate but less than compelling and a fit between means and end that is not necessarily narrowly tailored but has more than just an incidental connection.” Jay D. Wexler, Defending the Middle Way: Intermediate Scrutiny as Judicial Minimalism, 66 Geo. Wash. L.Rev. 298, 300 n. 15 (1998).

. As die Supreme Court recently emphasized in invalidating a prohibition on the receipt of honoraria by government employees, "[w]hen the government defends a regulation on speech ... it must do more than simply 'posit the existence of the disease sought to be cured.’ ... It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." United States v. National Treasury Employees Union, 513 U.S. 454, 475, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (citation and internal quotation omitted) (emphasis added).

. The dissent fails to mention that one of the purposes for the ordinance referred to by the Court in Struthers was crime prevention. See 319 U.S. at 144-45, 63 S.Ct. 862.

. Although we acknowledge that those decisions arose from a stricter level of scrutiny than we employ here and somewhat different circumstances, the fact remains that the Court has generally tilted for the First Amendment in the tension between press freedom and privacy rights. This is bemoaned by the dissenting Justices in The Florida Star, who state candidly they "would strike the balance rather differently.” 491 U.S. at 552, 109 S.Ct. 2603 (White, J., dissenting). So, apparently, would the dissent in this case.

. The opposing views of deterrence were noted in connection with capital punishment in Chief Justice Burger's dissenting opinion in Furman v. Georgia, 408 U.S. 238, 395-96, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).